CNA CASUALTY OF CALIFORNIA, Plaintiff-Appellant, v. E.C. FACKLER, INC., *et al.*, Defendants (Michael T. McRaith, Acting Director, The Department of Financial and Professional Regulation-Division of Insurance, in his Capacity as Statutory and Court-Affirmed Liquidator, Defendant-Appellee).

First District (2nd Division) No. 1—04—3707

Opinion filed September 20, 2005.

Wilson, Elser, Moskowitz, Edelman & Dicker, of Chicago (Daniel J. McMahon, Rebecca M. Rothmann, and Cinthia Motley, of counsel), for appellant.

John H. Wickert and Susan Valentine, both of Robinson, Curley & Clayton, P.C., and D. Daniel Barr, J. Kevin Baldwin, and Michael Buresh, all of Office of Special Deputy Receiver, both of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

E.C. Fackler was in the business of administering trusts for employers who wanted to self-insure against workers' compensation claims. Fackler managed three self-insurance trusts into insolvency. The issue in this case is whether Fackler's professional liability policy requires its insurance company to cover claims for lost funds.

Plaintiff CNA Casualty of California (CNA) sought a declaration that it was not required to pay claims asserted against its insured, E.C. Fackler, Incorporated, and a successor corporation, E.C. Fackler Insurance Services, Incorporated (Fackler), by the acting Director of the Illinois Department of Financial and Professional Regulation (the Director). The Director is acting as a statutory and court-affirmed liquidator of three trusts Fackler administered. CNA contends the Director's claims fall under several exclusions in Fackler's professional liability insurance policy. The trial court disagreed and entered a final judgment against CNA. The court found CNA was obligated to cover Fackler's losses under its policy. We reverse and remand with directions to enter judgment for CNA.

FACTS

The professional liability policy (Policy) CNA issued Fackler states:
"[CNA] will pay on behalf of [Fackler] all sums which [Fackler] shall become legally obligated to pay as Damages and Claim Expenses resulting from any Claim first made against [Fackler] and reported to [CNA] in writing during the Policy Period for any Wrongful Act of [Fackler] ***."

On the "Third Party Administrators/Insurance Agents and Brokers Endorsement" page, the Policy excluded several claims, including:

> "any Claim arising out of any actuarial act, error, omission or assumptions;
>
> \* \* \*
>
> \*\*\* any Claim arising out of or in connection with a governmental intervention, cease and/or desist order, or the insolvency, receivership, bankruptcy, licensing, liquidation or inability to pay of any insurer, trust, organization, or other vehicle directly or indirectly in which [Fackler] has placed or obtained insurance coverage, or placed funds of a client or account."

The Policy states:

> "Claim means any demand received by [Fackler] for Damages alleging a Wrongful Act including a civil action or suit or institution of arbitration proceedings. A Claim does not include criminal or regulatory proceedings or a request or demand seeking non-pecuniary relief including declaratory or injunctive relief or any other provisional remedy. [CNA], at its sole discretion, may choose to defend any regulatory proceedings brought against [Fackler]."

In the early 1990s, Fackler solicited employers to participate in three trusts: the Illinois Earth Care Workers' Compensation Trust (Earth Care Trust), the Illinois Electrical Employers Workers' Compensation Association (Electrical Trust), and the Illinois Environmental Service Workers' Compensation Trust (Environmental Trust) (collectively, the Trusts). The Trusts were established pursuant to section 4a of the Workers' Compensation Act (820 ILCS 305/4a (West 1998)), which allowed trade associations to self-insure their members' workers' compensation liability by forming a pool.

Fackler formed service agreements with the Trusts to act as their third-party administrator. For example, the Earth Care Trust service agreement (Service Agreement) stated Fackler was responsible for, among other things, processing applications, collecting and depositing all contributions in the trust fund depository, claims processing, procuring reinsurance, and other management-related services. Employers participating in the Earth Care Trust signed pooling agreements. The pooling agreements also listed Fackler's responsibilities, including to "collect and deposit to the Trust bank depository all contributions and assessments, if any."

Fackler's renewal application for the Policy indicated 99% of the services it rendered were as "TPA/Pool administrator (Workers' Compensation Only)." Fackler listed the Trusts as its three largest clients and that it provided pool administration services to the Trusts.

In 1998, the Director began an examination of Fackler and found its negligent management jeopardized the Trusts' financial status. On November 4, 1999, the Director revoked Fackler's license to administer and manage trusts. CNA characterizes the order of revocation as a "cease and desist" order. Orders of liquidation of the three Trusts were entered as follows: the Earth Care Trust on October 26, 2000; the Electrical Trust on November 3, 2000; and the Environmental Trust on March 22, 2001. The circuit court appointed the Director as the Trusts' liquidator. In that capacity, the Director filed two suits—on behalf of the Earth Care Trust on November 30, 2000, and on behalf of the Electrical and Environmental Trusts on September 19, 2001,[1] against Fackler, the Trustees, and Illinois Zephyr, Incorporated—Fackler's "major insurance producer"—on behalf of the Trusts. CNA defended Fackler in the underlying lawsuits.

In the underlying suits, the Director claimed Fackler was liable for breaching its fiduciary duty to the Trusts, negligent misrepresentation, and aiding and abetting the breach of fiduciary duty. The Director's claims were based in part on Fackler's failure to charge sufficient premiums.

The trial court found none of the policy's exclusions barred the Director's recovery. The trial court found the insolvency exclusion did not apply because Fackler did not "place[ ] or obtain[ ] insurance coverage, or place[ ] funds of a client" into the insolvent trusts. The court found coverage was not excluded by the policy's governmental intervention language because the Director's claim was for losses that occurred before the government initiated proceedings against Fackler. The court also decided the policy's exclusion for actuarial acts did not apply.

## DECISION

### I. Standard of Review

■ CNA appeals the trial court's denial of its motions for judgment on the pleadings and its entry of a judgment in favor of the Director. A motion for judgment on the pleadings is similar to a motion for summary judgment but is limited to the pleadings and written instruments attached to the pleadings as exhibits. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 138-39, 708 N.E.2d 1122 (1999). A judgment on the pleadings is proper if no genuine issue of material fact exists and the parties' rights can be decided as a matter of law. *Employers Insurance of Wausau*, 186 Ill. 2d

---

[1]The trial court consolidated the two suits.

at 138. Accordingly, this court applies *de novo* review. *Kim v. State Farm Fire & Casualty Co.*, 312 Ill. App. 3d 770, 772, 728 N.E.2d 530 (2000).

II. Insolvency Exclusion

CNA contends the policy's insolvency exclusion bars the Director's claims.

The trial court found the exclusion did not apply because Fackler did not place or obtain insurance coverage or place funds of a client or account. The court relied in part on the Illinois Workers' Compensation Pool Law (Pool Law) (215 ILCS 5/107a.01 *et seq.* (West 2002)), effective January 1, 2001. The trial court said:

> "As stated by CNA themselves, the Illinois Worker's [*sic*] Compensation Pool Law provides that, rather than purchasing commercial insurance, certain *employers* may pool their worker's [*sic*] compensation risk through agreements with administrators, who in turn manage self-insured pools to provide workers' compensation benefits to participant employers. [Citation.] Thus, CNA's argument that Fackler placed the funds of its clients into the pools contradicts the above cited workers compensation law as it is the employers who place funds into the pools, not Fackler, who is the pool administrator and manager." (Emphasis in original.)

We must "construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073 (1993). As with any contract, we must ascertain CNA and Fackler's intent when they signed the Policy by looking at its language. *Benedict v. Federal Kemper Life Assurance Co.*, 325 Ill. App. 3d 820, 824, 759 N.E.2d 23 (2001). When doing so, if the court finds that the language of the Policy is susceptible to more than one meaning, then an ambiguity is present, and we may consider parol evidence to resolve the ambiguity. *Benedict*, 325 Ill. App. 3d at 824. Any unresolved ambiguity will be construed against the insurer. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 393, 830 N.E.2d 575 (2005). Undefined terms are given their plain, ordinary, and popular meaning. *Gillen*, 215 Ill. 2d at 393. In this case, our analysis focuses on the Policy's exclusions, which will be read narrowly and will be applied only where the terms are clear, definite, and specific. *Gillen*, 215 Ill. 2d at 393.

Looking at the plain language of the insolvency exclusion at issue, we believe the exclusion bars coverage if Fackler (1) placed or obtained insurance coverage in the insolvent trusts, *or* (2) placed client funds

into the insolvent trusts. We now examine whether Fackler did either of these things according to the Policy.

A. *Placing or obtaining insurance coverage*

CNA contends the trial court's conclusion that Fackler did not place or obtain insurance coverage draws "an illogical distinction" between self-insurance trusts and traditional insurance. CNA contends the Policy's clear language does not treat the Trusts differently since they are a type of self-insurance. The policy's exclusion covers "any insurer, trust, organization or other vehicle," which CNA contends conveys the parties' intent to encompass all forms of insurance, not just insurance offered by commercial carriers.

Risk-pooling trusts—a form of self-insurance—have been described as both "the 'antithesis' of insurance and the 'functional equivalent' to insurance, depending upon the nature of the analysis and the particular facts and circumstances of each case." *Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange*, 325 Ill. App. 3d 970, 977, 758 N.E.2d 353 (2001), comparing *State v. Continental Casualty Co.*, 126 Idaho 178, 183, 879 P.2d 1111, 1116 (1994), with *Ohio Government Risk Management Plan v. County Risk Sharing Authority, Inc.*, 130 Ohio App. 3d 174, 180, 719 N.E.2d 992, 996 (1998); see also *USX Corp. v. Liberty Mutual Insurance Co.*, 269 Ill. App. 3d 233, 241-43, 645 N.E.2d 396 (1994) (the court noted self-insurance was an alternative to commercial insurance under the Workers' Compensation Act (820 ILCS 305/4 (West 1992))).

In *Chicago Hospital Risk Pooling Program*, 325 Ill. App. 3d 970, 758 N.E.2d 353, a doctor carried malpractice insurance through a commercial carrier and through his employer's self-insurance trust. When the doctor was sued, he selected coverage only under the trust and not under his private policy. The trust settled the case and then brought an equitable contribution action against the commercial insurer to recoup some of the cost. The commercial insurer contended the doctor selectively tendered the claim to the trust, preventing the trust from seeking equitable contribution. The trust contended that, as a self-insurance program, the selective tender rule did not apply to it. The Religious and Charitable Risk Pooling Trust Act stated risk-pooling trusts "shall not be considered insurance companies or to be in the business of insurance." 215 ILCS 150/25 (West 1998). Nonetheless, this court concluded the statutory language did not exempt the trust from its common law contractual rights, duties, and obligations. *Chicago Hospital Risk Pooling Program*, 325 Ill. App. 3d at 977. Based on the trust agreement, which purported to be a contract of insurance, the court found the risk-pooling trust should not be treated differently

than a traditional insurer for the purpose of applying the selective tender rule. *Chicago Hospital Risk Pooling Program*, 325 Ill. App. 3d at 978.

In this case, both parties contend various statutes support their positions regarding the treatment of self-insurance programs.

CNA argues the Pool Law (215 ILCS 5/107a.01 *et seq.* (West 2004)) "treats self-insured pools or trusts as the authorized legal equivalent to traditional insurance coverage." On the other hand, the Director contends the Pool Law does nothing to indicate the parties' intent because it was written after the Policy. The Director contends we should look at the Workers' Compensation Act (the Act) as it existed when the Policy was written. Before it was repealed, effective January 1, 2001, section 4a of the Act provided:

> "The Department of Insurance shall adopt rules permitting 2 or more employers with similar risk characteristics or that are members of a bona fide professional, commercial, industrial or trade association to enter into agreements to pool their liabilities under this Act and to pool employers' liability exposures for the purpose of qualifying as group self-insurers." 820 ILCS 305/4a (West 1998).

According to the Director, this Act supports his contention that the employers did not obtain insurance but were merely self-insured.

CNA responds that the new Pool Law specifically includes group self-insurers that already existed under the Act.[2] See 215 ILCS 5/107a.04(a), (d) (West 2004) (group self-insurers with a certificate of authority issued pursuant to the Workers' Compensation or Workers' Occupational Diseases Acts "shall then be deemed to be a qualified group workers' compensation pool and shall be subject to this Article"). CNA further contends the repealed section of the Act does not dispute that the Trusts are an equivalent of insurance. Under the repealed section 4a of the Act, group self-insurers were required to pay into a state-monitored insolvency fund (see 820 ILCS 305/4a(2), (4) (West 1998)). CNA contends the mandatory participation in the insolvency fund shows the parties never intended the Policy to serve as a guarantee of the Trusts' solvency.

In addition to the above statutes, we also consider the trust agreement, as the court in *Chicago Hospital Risk Pooling Program* did. Here, the trust agreement states:

---

[2]Although the Pool Law did not become effective until January 1, 2001, after the Policy was formed, it states in its definitions section that for purposes of incorporating provisions of the Illinois Insurance Code, " '[p]ooling agreement' shall be considered a policy of insurance." 215 ILCS 5/107a.05(b) (West 2004).

"[T]he Participants desire to create a trust vehicle to provide workers' compensation, occupational disease and other employer liability coverage for the benefit of its Participants' employees on a group basis;

\* \* \*

Trustees have undertaken and agree to be the legal owner of and to hold funds in trust, for the purpose of providing a group self-insurance program \*\*\*."

Under a section titled "Purpose of Trust," the trust agreement stated, "The Trust is created for the purposes of providing and maintaining workers' compensation, occupational diseases and employers' liability benefits on a group basis \*\*\*."

The Trusts would serve to make payments of benefits as provided under the above-mentioned statues and similar employer liability laws. The trust agreement also stated participants became parties to the agreement by agreeing to any pooling agreement. The pooling agreement included in the record further outlined the participants' obligations and the coverage provided by the Trusts.

■ Based on the trust and pooling agreements, we conclude the Trusts were the functional equivalent of insurance for the participant employers. Additionally, looking at the Policy as a whole, we find the parties intended the phrase "trust \*\*\* in which [Fackler] has placed or obtained insurance coverage" to include the risk-pooling Trusts. Fackler indicated on its renewal application that 99% of its business consisted of pool administration for the Trusts. The exclusions page was clearly titled, *"Third-Party Administrators/*Insurance Agents and Brokers Endorsement." (Emphasis added.) We find it unlikely that CNA, knowing the nature of Fackler's business, intended the Policy's exclusions to apply to only 1% of Fackler's activities. If CNA intended to exclude coverage in the event Fackler brokered insurance with an insolvent traditional carrier, why would CNA then assume coverage of three self-insurance trusts that were subject to the same obligations, especially where the Trusts made up the bulk of Fackler's business activities?

Accordingly, we conclude Fackler bought the Policy to cover its administration of the Trusts, and CNA added the exclusions to limit its risk exposure under certain circumstances, including the insolvency of the Trusts. Both knew what the Policy was intended to cover and what it excluded.

## B. *Placing client funds*

CNA contends the trial court also erred when it found Fackler did not "place funds of a client" when it collected and deposited employ-

ers' contributions in the fund. The trial court reasoned the employers, and not trust administrators like Fackler, placed their money into the Trusts based on the Pool Law.

The Pool Law allows employers to pool their money into trusts as a method of self-insurance for workers' compensation claims. 215 ILCS 5/107a.01 *et seq.* (West 2004). CNA contends this statute simply allows employers to join trusts like those that became insolvent in this case. It does not dictate or limit what method employers use to pay their contributions, either directly or through a third-party administrator like Fackler. Additionally, CNA points out that both the Trusts' service agreements and the pooling agreements signed by the employers state Fackler was responsible for collecting *and* depositing employer contributions into the Trusts' depositories.

The Director contends Fackler did not place client funds by collecting and depositing the employers' trust contributions because the Trusts, not the employers, were Fackler's clients. Because Fackler did not place the Trusts' funds in an insolvent insurer or other vehicle, the Director contends the policy's insolvency exclusion does not bar coverage. Although the Policy does not define "client," the Director argues we should construe "client" to mean the Trusts, because Fackler's application for renewal lists the Trusts as its largest clients. Likewise, the service agreements formed between Fackler and the Trusts define "client" as the Trusts, not the participant employers.

The Director relies on *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82 (2d Cir. 1998). In that case, the United States Court of Appeals for the Second Circuit determined the term "client" was ambiguous and required further inquiry in the trial court. There, the policy excluded coverage for "any claim arising from the financial inability to pay of any insurer or reinsurer with which the Assured has placed or obtained coverage for a client or an account." *Alexander*, 136 F.3d at 84. Although the exclusion in *Alexander* is similar to the one in this case, the facts are not.

In *Alexander*, the plaintiff (A&A) was an insurance brokerage conglomerate seeking coverage for losses it incurred defending an action against Mutual Fire, an insolvent insurance company managed by A&A's subsidiary. The parties disputed whether A&A's "clients" included policyholders whose business originated with independent brokers and for whom A&A placed Mutual Fire policies. After looking at the customs of the trade, the court determined the term "client" was ambiguous. As further support for this finding, the court emphasized the parties' uncertainty during oral argument as to the meaning of the word. *Alexander*, 136 F.3d at 87.

In this case, CNA contends Fackler, as a third-party administrator, acted on behalf of both the Trusts and the participant employers due to the relationship between the Trusts and the employers. According to the trust agreement, the employers were parties to the Trusts. The trust agreement says: "Whereas, the Participants desire to create a trust vehicle to provide worker's compensation, occupational disease and other employer liability coverage for the benefit of its Participants' employees on a group basis." CNA also contends the employers were Fackler's clients because Fackler solicited them to participate in the Trusts, collected and deposited their premiums into the Trusts, and acted as their agent in handling claims.

When we extrapolate from the exclusion the words that are pertinent to our inquiry, the picture becomes clearer. That is, the policy excludes "any claim arising out of or in connection with the insolvency *** of any *** trust *** in which the insured [Fackler]*** has placed funds of a client."

The Director contends the Trusts were Fackler's clients. But that would require us to say the exclusion applies when the insured places the funds of a trust into a trust. That would not be a sensible reading. "Client" must mean something other than the Trusts. The only reasonable interpretation of the exclusion is that "client" was intended to refer to the participants in the Trusts. That is, the employers.

■ We do not believe the term "client" is an ambiguous term in the Policy based on the facts of this case. CNA has shown Fackler had extensive relationships with the employers participating in the Trusts. Using the "plain, ordinary, and popular" meaning of the word, we believe the employers became "clients" of Fackler when Fackler solicited them to participate in the Trusts and acted as their agent for deposits and claims. The pooling agreements themselves required Fackler to "collect *and deposit* to the Trust bank depository all contributions and assessments, if any" on behalf of the employers. (Emphasis added.) As a result, we believe the insolvency exclusion bars the Director's claim because it arises from the insolvency of a trust in which Fackler deposited its clients', the employers', funds. See also *Transamerica Insurance Co. v. South*, 125 F.3d 392, 398-400 (7th Cir. 1997) (applying Illinois law, the court found a policy's insolvency exclusion, which excluded coverage of claims arising out of insolvency of any organization (directly or indirectly) in which the insured has placed or obtained coverage or in which an insured has placed the funds of a client, applied where the insured encouraged clients to buy annuities from a company that later became insolvent).

Having shown that the employers were Fackler's clients, and that

Fackler placed their funds into the Trusts, the insolvency exclusion applies whether or not forming self-insurance trusts is tantamount to "placing or obtaining insurance coverage."

III. Governmental Intervention

A. *"Governmental Intervention"*
■ CNA contends coverage is excluded under the policy pursuant to the "governmental intervention" exclusion. The entire exclusion reads:

> *"to any Claim arising out of or in connection with a governmental intervention, cease and/or desist order*, or the insolvency, receivership, bankruptcy, licensing, liquidation or inability to pay of any insurer, trust, organization or other vehicle directly or indirectly in which the Insured has placed or obtained insurance coverage, or placed funds of a client or account." (Emphasis added.)

CNA says this exclusion applies because the Director is authorized and empowered by the Insurance Code to intervene in any insurer entity for the purpose of wrapping up its business, paying its outstanding claims, and recovering against those responsible for the financial failure of the insurer. CNA maintains the underlying claims arose during the Director's regulatory examination of Fackler's business activities and ended with the Director's lawsuits to recover the trust deficiencies from Fackler. The Director's standing to bring the underlying lawsuits, CNA says, is based on his statutory right to regulate, intervene, and control the endangered trusts.

CNA relies for its contention on several sections of the Insurance Code. Section 191 of the Code vests the Director with title to all property, contracts, and rights of action of the company as of the date of liquidation. 215 ILCS 5/191 (West 2002). Section 193 authorizes the Director to deal with the property, business, and affairs of the company in his name as director, or to bring a suit or claim against the directors or officers of the company on behalf of the creditors, members, policyholders or shareholders. 215 ILCS 5/193(1), (3) (West 2002). Section 464a provides that service agencies for group self-insurance must be licensed by the Department of Insurance and are subject to supervision and examination by the Department. 215 ILCS 5/464a (West 2002). Article 13 of the Code authorizes the Director to intervene in the insurer's business by commencing judicial proceedings to close, rehabilitate, or liquidate an insurer's business and distribute the assets to its creditors. 215 ILCS 5/187 *et seq.* (West 2002).

In response, the Director contends the liquidations of the pools are not "governmental interventions." Because the provision specifically

references "liquidation," "insolvency," and "receivership," the term "governmental intervention" cannot be synonymous with those terms. Thus, the term "governmental intervention" is ambiguous because it is not defined in the policy or in the Insurance Code. The Director also says the order of revocation was entered against Fackler, not any of the pools, and the order of revocation is not mentioned in any of the complaints filed by the Director against Fackler. The mere fact that both Fackler and the Director made separate claims to CNA does not mean the claims are related to each other.

We agree with CNA's interpretation of the language in the exclusion. The Insurance Code contains a statutory scheme allowing the Director to intervene in self-insured pools. The term "governmental intervention" is not rendered ambiguous by use of the words "liquidation," "insolvency," and "receivership" elsewhere in the exclusion. The language in the exclusion following the "governmental intervention" language appears to describe separate risks that are excluded under the policy. The liquidation proceedings brought under the authority of the Insurance Code are appropriately classified as a "governmental intervention."

## B. *"Arising Out Of"*

■ The trial court found the language, "arising out of or in connection with a governmental intervention," ambiguous and subject to different interpretations. The court found:

> "Based on [the language in the exclusion], it is unclear whether the actual losses constituting the claim must have resulted from governmental intervention or whether the exclusion applies to claims involved in governmental intervention at some stage after the losses were incurred."

CNA contends the court erred in finding the exclusion ambiguous because the word "losses" does not appear in the language of the exclusion. Instead, "any *claim*" arising out of or in connection with a governmental intervention is excluded. The word "claim" is defined in the policy as:

> "any demand received by the Insured for Damages alleging a Wrongful Act including a civil action or suit or institution of arbitration proceedings. A Claim does not include criminal or regulatory proceedings or a request or demand seeking non-pecuniary relief including declaratory or injunctive relief or any other provisional remedy."

The Director contends the exclusion does not apply because the losses alleged in the complaints resulted from errors and omissions committed by Fackler prior to any "governmental intervention." Nor

did the claim arise out of the governmental intervention, contends the Director, because the demand received by Fackler was aimed exclusively at pre-intervention conduct.

In our view, when on November 4, 1999, the Director revoked Fackler's license to manage the trusts, that was governmental intervention. The "claim" in this case was first made August 22, 2000, when the Director sent a notice of claim to CNA and Fackler. By then, all three trusts had been placed into conservation—the result of governmental intervention. And when the trusts were liquidated on October 26, 2000, November 3, 2000, and March 22, 2001, due to the Director's actions, that was governmental intervention. The Director filed lawsuits against Fackler on November 30, 2000, and September 19, 2001. The Director was seeking to recover money damages resulting from insolvency of the trusts, which, he alleged, resulted from Fackler's wrongful conduct.

The parties disagree about the definition of "arising out of." See *Consolidated R. Corp. v. Liberty Mutual Insurance Co.*, 92 Ill. App. 3d 1066, 1069, 416 N.E.2d 758 (1981) (defining the phrase as " 'causally connected with, not proximately caused by,' " quoting *Aetna Casualty & Surety Co. v. Ocean Accident & Guaranty Corp.*, 386 F.2d 413, 415 (3d Cir. 1967)); *Maryland Casualty Co. v. Chicago & North Western Transportation Co.*, 126 Ill. App. 3d 150, 154, 466 N.E.2d 1091 (1984) (" '[a]rising out of' has been held to mean 'originating from,' 'having its origin in,' 'growing out of' and 'flowing from' "). But see *United Services Automobile Ass'n v. Dare*, 357 Ill. App. 3d 955, 971 (2005) ("arising out of" language should not be interpreted broadly in an exclusion because to do so would expand the exclusion to the advantage of the insurer).

In this case, whether the claims "arose out of" the alleged governmental intervention is only part of the inquiry. The exclusion also provides the claims may be "in connection with" the intervention. The words "in connection with" imply that the timing of the claims is not controlling. The claims made here clearly are in connection with the "governmental intervention" alleged by CNA. We believe both parts of the exclusion apply to this case.

The use of the word "losses" by the Director and the trial court is belied by the language in the exclusion. The exclusion does not refer to losses; it refers, rather, to "any Claim." Once the Director's actions are classified as a governmental intervention, it is clear there were claims that were connected with the intervention, and the exclusion would apply.

C. *"Placed Funds of a Client or Account"*

■ The Director contends the exclusion for a claim "arising out of

or in connection with a governmental intervention" is limited by the phrase at the end of the exclusion, "in which the Insured has placed or obtained insurance coverage, or placed funds of a client or account." We disagree with the Director's interpretation. Reading the exclusion as a whole, the limiting language at the end of the exclusion clearly applies only to "the insolvency, receivership, bankruptcy, licensing, liquidation or inability to pay of any insurer, trust, organization or other vehicle." The exclusions related to governmental intervention or cease and/or desist orders are not limited by the wording at the end of the paragraph. Thus, the exclusion applies: "to any Claim arising out of or in connection with a governmental intervention, cease and/or desist order."

Although more precise drafting of the policy would have placed these exclusions into separate paragraphs, the word "or" separates the "governmental intervention" and "cease and/or desist order" exclusions from the other exclusions relating to liquidation, insolvency, etc. The latter exclusions are limited by the language regarding placing or obtaining insurance coverage or placing funds of a client or account. At least in this instance, there is no ambiguity.

IV. Actuarial Exclusion

■ CNA contends the "actuarial exclusion" provision excludes coverage for "any claim arising out of any actuarial act, error, omission or assumption." It says Fackler's alleged failure to properly calculate, assess, and collect premiums to meet the risk of potential claims falls within the plain and ordinary meaning of the actuarial exclusion.

We agree with the trial court that the actuarial exclusion does not apply. Although the term "actuary" is not defined in the policy, it is clear that Fackler was not acting as an actuary but as an administrator of the pools. The defendants in the underlying suits alleged Fackler hired an actuarial consulting firm. The claims do not fall within the actuarial exclusion.

CONCLUSION

We believe the Director's claims are barred under both the insolvency and governmental intervention exclusions, but not under the actuarial exclusion. Because either exclusion defeats the claims, we reverse the trial court's order granting judgment to the Director

634

and remand with directions to enter the appropriate judgment on the pleadings in favor of CNA.

Reversed and remanded with directions.

GARCIA, P.J., and SOUTH, J., concur.