In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1844

MARGERY NEWMAN, on behalf of herself and all others simi-
larly situated,

*Plaintiff-Appellant,*

*v.*

METROPOLITAN LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 3530 — **Thomas M. Durkin**, *Judge.*

ARGUED SEPTEMBER 19, 2017 — DECIDED FEBRUARY 6, 2018
AS AMENDED ON PETITION FOR REHEARING MARCH 22, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and ROVNER,
*Circuit Judges.*

WOOD, *Chief Judge.* At age 56, Margery Newman pur-
chased a long-term-care insurance plan from the Metropoli-
tan Life Insurance Company ("MetLife"). She opted for one of
MetLife's non-standard options for paying her insurance pre-
miums; MetLife called the method she selected "Reduced-Pay

at 65." When Newman was 67 years old, she was startled to discover that MetLife that year more than doubled her insurance premium. MetLife insists that the increase was consistent with Newman's insurance policy, including its Reduced-Pay-at-65 feature. Newman was unpersuaded and brought this action to vindicate her position. The district court dismissed for failure to state a claim. We conclude, however, that the dismissal was premature, and that Newman's complaint plausibly has alleged facts entitling her to relief. We therefore reverse and remand for further proceedings.

## I

Two documents lie at the heart of this case. The first is MetLife's "Long-Term Care Facts" brochure, which Newman reviewed before purchasing her insurance plan. The brochure describes long-term care generally and catalogs MetLife's non-standard payment options. Newman learned of MetLife's Reduced-Pay option from the brochure. The full description reads as follows:

> **Reduced-Pay at 65 Option:**
>
> By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums thereafter.

At the foot of the same page, MetLife instructs the reader that the brochure is only a general overview of MetLife's insurance plans, and that the policy governs the terms of the agreement.

Equipped with this information, Newman purchased a long-term-care insurance plan from MetLife and selected the Reduced-Pay option. Roughly a week later, she received the

policy—the second critical document. The policy is 29 pages long. It includes just one reference to the Reduced-Pay option:

> **In addition, you have selected the following flexible premium payment option: Reduced Pay at 65 Semi-Annual Premium Amount:**
>
> Before Policy Anniversary at age 65        $3231.93
> On or after Policy Anniversary at age 65    $1615.97

Elsewhere, the policy reserves MetLife's right to change the premium. On the first page, MetLife announces that "**PREMIUM RATES ARE SUBJECT TO CHANGE**." The same paragraph continues with the statement that "[a]ny such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued." In a section titled "Premiums," MetLife "reserve[s] the right to change premium rates on a class basis." Similar language is included in the "5% Automatic Compound Inflation Protection Rider." The policy defines more than 30 terms, but the word "class" is not among them. And the appended "Contingent Benefits Upon Lapse Rider," which provides coverage options in the event of a "Substantial Premium Increase," includes a table illustrating that that term's meaning varies with the policyholder's age at the time the policy was issued. The table accounts for policyholders who were issued their policy at ages up to "90 and over." Newman had the opportunity to review the policy for 30 days and return it for a full refund if she was dissatisfied.

From the outset, Newman paid the elevated premium associated with her Reduced-Pay option. When she reached age 65, her premium was cut in half. After Newman turned 67, however, MetLife doubled the premium. MetLife represents

that this increase has been imposed on a class-wide basis, which it said at oral argument means all long-term-care policyholders, including Reduced-Pay policyholders over the age of 65. MetLife defends the increase by noting that Newman still pays half the premium of a Reduced-Pay policyholder who has not yet reached age 65, and far less than she would if she had not purchased the Reduced-Pay option. Nevertheless, at age 67, Newman's semi-annual premium jumped to $3,851.80, greater than it has been at any other point during the life of the plan.

Newman filed a four-count complaint on behalf of herself and a proposed class. She has alleged that raising her post-anniversary premium is a breach of the policy, violates the Illinois Consumer Fraud and Deceptive Business Practices Act, and renders MetLife's representations and practices fraudulent. The district court granted MetLife's motion to dismiss for failure to state a claim. In its view, the contract unambiguously permits MetLife to raise Newman's premium, even after she reached age 65. This meant also that she had no claim for deceptive or unfair business practices or common-law fraud, because MetLife did nothing wrong. Newman's appeal from that decision is now before us.

## II

We consider *de novo* the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). A complaint survives a motion to dismiss if it states a claim that is plausible on its face. *Id.* The common-law and statutory fraud claims must be pleaded with the detail required under Rule 9(b)'s heightened standard. *Id.* The parties agree that Illinois law governs this case.

A

Illinois treats insurance policies the same way as any other contract. Parties are held to the unambiguous terms of their agreement. *Hobbs v. Hartford Ins. Co. of the Midwest,* 214 Ill. 2d 11, 17 (2005). A policy is ambiguous if it is subject to more than one reasonable interpretation. *Thompson v. Gordon*, 241 Ill. 2d 428, 443 (2011). Undefined terms are construed as an "average, ordinary, normal, and reasonable person" would understand them. *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill. 2d 381, 393 (2005). Importantly, an insured cannot manufacture ambiguity by taking portions of a policy in isolation; the policy (like any contract) must be read as a whole. *Thompson,* 241 Ill. 2d at 441.

Little in Newman's policy elucidates the terms of the Reduced-Pay option. It offers one illustration with two numbers: Newman's "before policy anniversary" premium; and her "on and after policy anniversary" premium. The first amount is twice the second. Newman deduced from this example that upon reaching her 65th birthday, her premium would drop to half of what it was the day before. MetLife agrees that this is what the policy says. The disagreement arises at the next level of detail. MetLife takes the position that the only guarantee is that from the policy anniversary following Newman's 65th birthday onward, Newman's premium will be half that of a Reduced-Pay policyholder who has not yet reached age 65. Newman reads the policy differently. She understands it to fix *her* post-65 premium at half the amount of *her* pre-65 premium.

Our independent review of the policy satisfies us that Newman has offered one reasonable interpretation of its language. The illustration, which was unexplained, reproduces

the cost of her personal premium. It gives no indication whether this is the same premium that all Reduced-Pay policyholders were paying and would pay, or if it was particular to Newman. A reasonable reader easily could think, however, that "on and after" the policy anniversary following age 65, the policyholder (here, Newman) would pay half of what she personally was paying prior to that anniversary date. Since the person's 65th birthday converts the pre-anniversary premium into a historical fact, a premium set at half that number likewise becomes fixed. In other words, if N is set in stone, so too is half of N.

MetLife responds that even if the portion of the policy referring to the Reduced-Pay option might be understood as we just explained, that reading is supportable only if that passage is divorced from the rest of the policy—an impermissible step. While it is true that the Reduced-Pay excerpt cannot be read alone, in this case the remainder of the contract does not win the day for MetLife.

Four times in the policy MetLife reserves its right to change the premium. Three of those instances reserve MetLife's right to do so on "a class basis" or for a "class as Yours." These passages do not resolve the ambiguity, because the word "class" is undefined. It might mean age, in which case class membership is independent of payment arrangements. But it might refer to the payment arrangement, so that everyone in the Reduced-Pay group comprises a single class and the effect of class membership is defined by the terms of the Reduced-Pay option.

Newman believes that it is the latter, and thus that the Reduced-Pay customers have purchased the right not to be

treated in the same way as ordinary policyholders. The policy's inclusion of the Reduced-Pay illustration, terse as it may be, supports her interpretation. Including language about class-wide changes did not alert her that she was part of a class that is broader than her Reduced-Pay group. Absent some clarification, Newman had no reason to question her understanding that she had removed herself from the class of typical policyholders—those who had not purchased a frozen premium after age 65. Even MetLife's reservation of the right to change the premium for all policies in a "class as Yours" does not help matters. Newman knew that her premium, and those of others whom she might regard as classmates, might increase before she turned 65. But the only "class" to which she thought she belonged was one that exchanged an increased (and perhaps variable) premium pre-65 for the right to have a stable and lower premium after 65. The baseline for a person in this class was the premium she paid pre-65; nothing in the policy tipped her off that the baseline was instead whatever people of her age were ordinarily charged, no matter how often or when that number changed or what payment arrangement was in place.

The fourth suggestion that the premium might change appears in the Lapse Rider. Though the rider countenances the possibility of a "Substantial Premium Increase," its illustrative table shows that the definition depends on the policyholder's age at the time of issuance. The rider accounts for policyholders who purchased their long-term-care policy at ages greater than 65. How, then, could the rider speak to the specifics of the Reduced-Pay option, which could be issued only to people who had not yet reached their 65th birthday? A reasonable person selecting the Reduced-Pay option could conclude that the rider was beside the point.

In short, none of the four references in the policy to Met-Life's right to change the premium suffice to disabuse a reasonable person of the understanding that purchasing the Reduced-Pay option took her out of the class of policyholders who were at risk of having their premium increased after their post-age-65 anniversary. The policy language is thus at least ambiguous, because it can be read reasonably to fix such a person's premium, if she had opted for the Reduced-Pay option.

What follows from that conclusion is less clear. Illinois construes ambiguous contracts against the insurer. See, *e.g.*, *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 223 Ill. 2d 407, 417 (2006); *Gillen*, 215 Ill. 2d at 393; *Hobbs*, 214 Ill. 2d at 15. But, MetLife answers, parties may introduce extrinsic evidence to resolve facial ambiguities before a court invokes the principle of *contra proferentem*. Indeed, an Illinois appellate court has said as much. *CNA Cas. of California v. E.C. Fackler, Inc.*, 361 Ill. App. 3d 619, 624 (2005); see also *Schuchman v. State Auto Prop. & Cas. Ins. Co.*, 733 F.3d 231, 238 (7th Cir. 2013) (citing *CNA Casualty of California* for the same rule).

Neither *Nicor*, *Gillen*, nor *Hobbs* rules out the possibility of admitting extrinsic evidence to disambiguate an insurance contract. In *Nicor* and *Hobbs* the contested contract was unambiguous, obviating the need to discuss extrinsic evidence. *Nicor*, 223 Ill. 2d at 434, 436–37; *Hobbs*, 214 Ill. 2d at 30–31. And nothing in *Gillen* indicates that the insurer sought to introduce extrinsic evidence. 215 Ill. 2d at 395–96. Outside the realm of insurance contracts, the Supreme Court of Illinois has ruled that extrinsic evidence may be introduced to resolve facial ambiguities. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462–63 (1999).

When sitting in diversity, our duty is to answer any question of state law in the same way (as nearly as we can tell) as the state's highest court would. *Bancorpsouth, Inc., v. Fed. Ins. Co.*, 873 F.3d 582, 586 (7th Cir. 2017). In the absence of conclusive authority from that court, we follow decisions of intermediate appellate courts unless there is reason to believe that the highest state court would reach a different conclusion. *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016). We have no such persuasive evidence that the Supreme Court of Illinois would disapprove of the state appellate court's decision in *CNA Casualty of California*, 361 Ill. App. 3d at 624, under which extrinsic evidence to resolve a facial ambiguity is admissible. We thus conclude that Newman's contract claim survives MetLife's motion to dismiss, but that on remand the parties may introduce extrinsic evidence to substantiate their reading of the contract. If, after that evidence is weighed, the district court concludes that it is still faced with ambiguity, the contract must be construed in Newman's favor for purposes of any further proceedings.

B

Newman separately has alleged that MetLife violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). The ICFA provides a remedy for consumers who have been victimized by deceptive or unfair business practices. 815 ILCS 505/2; *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). Newman has accused MetLife of both. We assess these allegations mindful of the fact that the ICFA is a mandate to provide consumers with the greatest possible relief. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 654–55 (2001).

A deceptive-practice claim under the ICFA has five elements:

> (1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception.

*Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005). MetLife argues that Newman's allegations do not satisfy the first two elements—deception and intent.

An allegedly deceptive act must be viewed "in light of *all the information* available to plaintiffs." *Phillips v. DePaul Univ.*, 2014 IL App (1st) 122817, ¶ 44 (emphasis in original). We must therefore consult both the brochure and the policy. Deception does not exist if a consumer has been alerted to the possibility of the complained-of result. *Davis*, 396 F.3d at 884. In MetLife's view, the brochure was not deceptive because it is consistent with what happened: after Newman reached age 65, her premium became half that of a policyholder who is not yet 65 years old. And even if the brochure was misleading, MetLife adds, the policy resolved any confusion.

MetLife's reading of the brochure is far from the only one that is possible—indeed, we find it strained. The Reduced-Pay option assures that after the anniversary date following the policyholder's 65th birthday, the holder will pay "half the amount of *your* pre-age 65 premiums thereafter" (emphasis added). This rationally can be read as an individualized re-

duction, tied to the consumer's personal baseline. The brochure never says that Newman's premium is linked to those of general policyholders. And for the reasons already discussed, MetLife's insistence that the policy clarifies matters is unpersuasive.

This case is quite different from one in which the consumer is warned about the undesirable result and simply misconstrues the material offered by the insurance company. See, *e.g.*, *Toulon v. Continental Cas. Co.*, 877 F.3d 725 (7th Cir. 2017). MetLife's brochure did not warn Newman about the possibility of a premium increase after her post-age 65 anniversary date, and as the record now stands, her reading of the policy is reasonable.

Turning to intent, Newman must show that MetLife intended for her (and those in her position) to rely on the brochure. *Cuculich v. Thomson Consumer Elec., Inc.*, 317 Ill. App. 3d 709, 716 (2000). Noting the printed caveat that the brochure is a general overview, MetLife argues that it did not intend that she rely on that document. The actual terms, it stresses, were in the policy. It cites *Commonwealth Insurance Co. v. Stone Container Corp.*, 351 F.3d 774 (7th Cir. 2003), where we ruled that an insurance provider did not intend that consumers rely on its policy summary. *Id.* at 779. The summary included a disclaimer that the policy governed the actual terms of the agreement. And that policy provided extensive details about coverage. *Id.* at 777–79. MetLife argues that this case is the same. But unlike the insurance provider in *Commonwealth Insurance*, MetLife never described the Reduced-Pay plan anywhere outside the brochure. Newman could have parsed every word in the insurance policy and never found infor-

mation that would have corrected her impression of the Reduced-Pay option. MetLife must have intended for consumers to rely on its brochure: it was the only place that described the Reduced-Pay option.

Nothing we have said conflicts with the Supreme Court's instruction in the analogous context of ERISA plans that summary plan descriptions are not part of the ERISA plan itself. See *CIGNA Corp. v. Amara*, 563 U.S. 421, 436 (2011). Newman is not relying on the brochure to supply the terms of her policy; she relies on it only as evidence of deception and the subsequent unfairness of MetLife's rate increase. In any event, there is reason to pause before transposing every detail of ERISA to ordinary insurance contracts. In *CIGNA Corp.*, CIGNA had sent its employees a newsletter and plan summary, as required under ERISA. The summary inaccurately characterized upcoming changes in the pension plan. *Id.* at 426; see also *Amara v. CIGNA Corp.*, 775 F.3d 510, 515 (2d Cir. 2014). Eleven months later, CIGNA distributed the actual plan, which filled in the details. *CIGNA Corp.*, 563 U.S. at 426–28. The Supreme Court ruled that only a violation of the plan's terms, as opposed to the summary's description of those terms, could support a lawsuit. *Id.* at 436–38.

The Court's decision is faithful to language in the statute that distinguishes information about the plan from the plan itself. 29 U.S.C. § 1022(a); *CIGNA Corp.*, 563 U.S. at 436. ERISA divides responsibilities for drafting the terms of the plan and drafting the plan summary. The plan's sponsor (the employer) is responsible for the plan, while the plan's administrator (a trustee-like fiduciary) drafts the summary. §§ 1021(a), 1102; *CIGNA Corp.*, 563 U.S. at 437. Nothing in the

statute conveys an intent to allow plan administrators indirectly to set the terms of the plan. *CIGNA Corp.*, 563 U.S. at 437. And the Court recognized that ERISA both requires plan summaries and establishes their purpose, which is to describe the plan "in a manner calculated to be understood by the average plan participant … ." § 1022(a); *CIGNA Corp.*, 563 U.S. at 437. If plan summaries were binding, plan administrators would be forced to write summaries with a level of detail ill-suited for their purpose.

Beyond the statutory distinction, Newman is in a different position from that of an ERISA beneficiary. Unlike an ERISA beneficiary, Newman is shopping on the open market. MetLife uses its brochure to compete for business. Pre-purchase, it is all a potential customer has to rely on. An employer, in contrast, is providing and describing an employment benefit. MetLife's situation is thus materially different from that of an employer offering an ERISA plan. Our decision here thus comfortably coexists with *CIGNA Corp.*

Returning to the Reduced-Pay policy, we must next consider whether Newman has adequately pleaded that MetLife's practices were unfair (as opposed to deceptive). Unfairness under the ICFA depends on three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). A significant showing that any of the three factors is met is enough; so too are facts that, to a lesser degree, satisfy all three. *Id.* at 418.

Newman has alleged that MetLife engaged in a bait-and-switch strategy, which (if proven) would offend Illinois's public policy. The State has twice condemned the very practice

Newman describes. See 215 ILCS 5/149(1) (forbidding insurance companies from misrepresenting the terms of their policies); ILL. ADMIN. CODE tit. 50, § 2012.122(b)(4) (forbidding misrepresentation in marketing policies for long-term-care insurance). MetLife does not dispute the applicability of the statute or the administrative code. It simply reiterates its position that there is no violation because the brochure did not misrepresent the policy. But we already have shown how both the brochure and the policy can be understood in the way Newman read them.

The second factor also supports Newman's complaint. Whether a practice is immoral, unethical, oppressive, or unscrupulous depends on whether it has left the consumer with little choice but to submit to it. See *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 610 (7th Cir. 2013). MetLife argues that once it raised the premium, Newman had three options: accept reduced benefits, get a new plan, or let the policy lapse and rely on the contingent coverage rider she purchased. Each of those proposals fails to recognize the fact that by abandoning her Reduced-Pay plan, Newman would forfeit eight years of sunk costs. Every dollar she spent pre-age 65 that exceeded what she would have been paying under the normal long-term-care plan was an investment that could bear fruit only if she stayed with the policy. Any of MetLife's proposed alternatives would cost her that entire investment.

Newman also has alleged substantial injury. MetLife induced her to pay a premium for eight years at a rate greater than she would otherwise have paid. She did so to reap benefits later in life. The injury lies in the difference between her elevated pre-age-65 premium and the standard premium, or the elevated premium she has had to pay (so far) for over two

years. Newman's complaint alleges facts that plausibly show that MetLife's policy was both deceptive and unfair.

C

Finally, Newman has asserted that MetLife's representations about the Reduced-Pay option in its brochure and policy constitute common-law fraudulent misrepresentation and fraudulent concealment. The elements of misrepresentation largely overlap with a deceptive-practices claim under the ICFA. The plaintiff must allege:

> (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance.

*Doe v. Dilling*, 228 Ill. 2d 324, 342–43 (2008). Our discussion of the ICFA claims subsumes the first, third, and fifth elements, and so we need say no more about them. The second element is not seriously at issue. In Illinois, a defendant knowingly misrepresents a fact if it makes a statement "with a reckless disregard for its truth or falsity." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 193 (1989); see also *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (finding the elements of fraudulent misrepresentation satisfied because a bank offered, but refused to honor, a permanent mortgage modification). MetLife portrayed its policy as one that offered a fixed premium after age 65. Newman has alleged that it did so in bad faith, intending not to honor that representation. She also asserts that MetLife disseminated information about the

Reduced-Pay option with at least reckless disregard for the truth.

Newman had to provide enough in her complaint to make a plausible case for reasonable reliance. *Davis*, 396 F.3d at 882. Reliance is not justifiable if a consumer has reason and opportunity to question the truth of the alleged misrepresentation. *Id.* For example, reliance on a loan agent's account of the terms of a loan agreement is unjustified when the consumer also has documentation of the terms of the loan and those documents conflict with the oral statement. *Id.* at 882–83. But it is reasonable to rely on a misrepresentation if nothing impugns its veracity. See *Miller*, 326 Ill. App. 3d at 651–52. Newman's reliance on the brochure was reasonable—it was the only information available to her before she made her purchase. When she received the policy, she looked at that too. The 30-day refund provision gave her an opportunity to review the terms of the policy and clarify any resulting confusion. But she found nothing in the policy to undermine her understanding of it. Indeed, she had no reason to doubt her interpretation until the company raised her premium roughly a decade later.

Finally, Newman's complaint has alleged fraudulent concealment. For this claim, Newman must adequately plead that MetLife concealed material information while under a duty to disclose. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1996). Such a duty may arise when a defendant makes a statement "that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397–98 (7th Cir. 2009). In *Crichton*, the insured did not meet this standard because the communications from the insurance provider never purported to explain all the underwriting factors that might

affect the premium. *Id.* at 398. Newman's fraudulent conceal-ment claim, in contrast, stands on the policy and the brochure. Together, she contends, they were the "whole truth." The brochure told Newman that her rate would be fixed. Though it also instructed policyholders to look to the policy, the policy did not reveal how MetLife intended to treat Reduced-Pay policyholders. Newman thus alleges that she reasonably believed that her post-anniversary rate was fixed. That was enough, under the pleading rules that prevail in federal court.

## III

Newman asserts that MetLife lured her into a policy by promising a trade of short-term expense for long-term stability. She took the deal and spent nine years investing in a plan, only to have MetLife pull the rug out from under her. Neither MetLife's brochure nor the terms of the policy forecast this possibility. These allegations were enough to state a claim under the theories Newman presented. We therefore REVERSE the district court's grant of MetLife's motion to dismiss and REMAND for further proceedings.