12-2894-cv
*State of New York v. Next Millenium Realty*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2012

(Argued:     May 13, 2013          Decided:     October 15, 2013)

Docket No. 12-2894-cv

---

STATE OF NEW YORK, JOSEPH MARTENS, as Commissioner of the New York State
Department of Environmental Conservation,

*Plaintiffs-Appellants,*

v.

NEXT MILLENIUM REALTY, LLC, 101 FROST STREET ASSOCIATES, L.P.,

*Defendants-Consolidated Plaintiffs-*
*Consolidated Defendants-*
*Cross Defendants-Appellees,*

101 FROST STREET CORPORATION, PAMELA SPIEGEL SANDERS, as Executor of the
Last Wills and Testaments of, and duly authorized Administrators of the Estate
of, Emily Spiegel and Jerry Spiegel, LISE SPIEGEL WILKS, as Executor of the Last
Wills and Testaments of, and duly authorized Administrators of the Estate of,
Emily Spiegel and Jerry Spiegel, ISLAND TRANSPORTATION CORPORATION,

*Defendants-Consolidated Defendants-*
*Appellees,*

UTILITY MANUFACTURING CO., INC., NEST EQUITIES, INC., AUDIE KRANZ, WILBUR KRANZ, KARMAL CHOPRA, TISHCON CORP., A/K/A TISHCON CORPORATION, JOE ELBAZ, GRAND MACHINERY, INC., WILLIAM GROSS,

*Defendants-Consolidated Defendants-Cross Defendants-Appellees,*

ARKWIN INDUSTRIES, INC., WILLIAM MAGLIO, as Executor of the Last Will and Testament of, and duly authorized Administrator of the Estate of, defendant Daniel Berlin, FRANK JACOBSON, as Executor of the Last Will and Testament of, and duly authorized Administrator of the Estate of, defendant Daniel Berlin, THOMAS ALLOY, EQUITY SHARE I ASSOCIATES,

*Defendants-Consolidated Defendants-Cross Defendants-Cross Claimants-Appellees,*

BAROUH EATON ALLEN CORP., 2632 REALTY DEVELOPMENT CORPORATION, RICHARD DEGENHART, ATLAS GRAPHICS, INC., H.D.P. PRINTING INDUSTRIES CORP., IMC EASTERN CORPORATION, F/K/A IMC MAGNETICS CORP., NMB (USA) INC.,

*Defendants-Appellees,*

PAUL MERANDI,
*Defendant-Consolidated Defendant-Cross Defendant,*

C&O REALTY CO.,

*Defendant-Cross Defendant-Appellee,*

SULZER METCO (US) INC.,

*Third-Party Defendant-Cross-Defendant-Appellee,*

- 2 -

ADCHEM CORP., LINCOLN PROCESSING CORP., NORTHERN STATE REALTY CO., PUFAHL REALTY CORP.,

*Consolidated Defendants-Third-Party Defendants-Cross Defendants*,

JOSEPH PUFAHL, CHARLES PUFAHL, HERMAN PUFAHL, JOHN PUFAHL, MARVEX PROCESSING CORP., UNICORD, AUTOLINE AUTOMOTIVE CORP., COBRALINE MANUFACTURING, MARKI REALTY, PHYSIO-CHEM, INC., BRONCO MODEL CRAFT, INC., APPLIED MAGNETICS, HYMAN HASS,

*Consolidated-Defendants*,

KORG U.S.A. INC., US-1 MARKETING GROUP, INC., Individually and as Successor to Cobraline Manufacturing Corp., VISHAY GENERAL SEMICONDUCTOR, INC., Individually and as Successor to General Semiconductor, Inc., and General Instruments Corporation, GENERAL SEMICONDUCTOR, INC., VISHAY MIC TECHNOLOGY, INC., Individually and as Successor to General Semiconductor, Inc. and General Instruments Corporation, GENERAL INSTRUMENTS CORPORATION,

*Third-Party Defendants-Cross Defendants*,

VERIZON NEW YORK, INC., Individually and as Successor to GTE Operations Support Incorporated, GTE CORPORATION, GTE SYLVANIA INCORPORATED, SYLVANIA ELECTRIC PRODUCTS INCORPORATED, VERIZON INC., VERIZON, VERIZON INC., Individually and as Successor to GTE Operations Support Incorporated, GTE CORPORATION, GTE SYLVANIA INCORPORATED, SYLVANIA ELECTRIC PRODUCTS INCORPORATED, VERIZON NEW YORK INC., VERIZON, VERIZON COMMUNICATIONS, Individually and as Successor to GTE Operations Support Incorporated, GTE CORPORATION, GTE SYLVANIA INCORPORATED, SYLVANIA ELECTRIC PRODUCTS INCORPORATED, VERIZON INC., VERIZON, GTE OPERATIONS SUPPORT INCORPORATED, Individually and as Successor to GTE Corporation, GTE SYLVANIA INCORPORATED, SYLVANIA ELECTRIC PRODUCTS INCORPORATED, VISHAY INTERTECHNOLOGY, INC., Individually and as Successor to Vishay General Semiconductor, Inc., GENERAL SEMICONDUCTOR, INC., and GENERAL INSTRUMENTS

CORPORATION, GTE CORPORATION, GTE SYLVANIA INCORPORATED, SYLVANIA ELECTRICAL PRODUCTS INCORPORATED,

*Third-Party Defendants,*

JERRY GOODMAN, EMILY SPIEGEL, as Trustee under an Agreement of Trust for the benefit of Pamela Spiegel and Lisa Spiegel,

*Defendants-Cross Defendants,*

SCIBELLI BROTHERS AUTO COLLISION, INC., JOSEPH SCIBELLI, SAM-TON TOWING & SALVAGE INC.,

*Defendants.*

————————————

Before:

CHIN AND LOHIER, *Circuit Judges*,
AND SWAIN, *District Judge.*[*]

————————————

Appeal from a judgment of the United States District Court for the

Eastern District of New York (Feurstein, *J.*), dismissing claims by the State of

New York under the Comprehensive Environmental Response, Compensation,

and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*, for costs incurred in

investigating and addressing groundwater contamination in Hempstead, New

———————————

[*]     The Honorable Laura Taylor Swain, of the United States District Court for the Southern District of New York, sitting by designation.

- 4 -

York.  The district court granted summary judgment in favor of the defendants-appellees on the ground that the action was time-barred.

VACATED and REMANDED.

_____

BARBARA D. UNDERWOOD, Solicitor General
(Cecelia C. Chang, Deputy Solicitor
General,  Matthew W. Greico, Assistant
Solicitor General, *on the brief*), for Eric T.
Schneiderman, Attorney General of the
State of New York, New York, New York,
*for Plaintiffs-Appellants*.

KATHLEEN M. SULLIVAN (William B. Adams, *on
the brief*), Quinn Emanuel Urquhart &
Sullivan, LLP, New York, New York, and
Kevin Maldonado, Kevin Maldonado &
Partners LLC, Windham, New York,
*for Defendants-Appellees Next Millennium
Realty, LLC, 101 Frost Street Associates, L.P.,
101 Frost Street Corporation, Pamela Spiegel
Sanders, as Executor of the Last Wills and
Testaments of, and duly authorized
Administrators of the Estate of, Emily Spiegel
and Jerry Spiegel, Lise Spiegel Wilks, as
Executor of the Last Wills and Testaments of,
and duly authorized Administrators of the
Estate of Emily Spiegel and Jerry Spiegel,
Emily Spiegel, as Trustee under an Agreement
of Trust for the benefit of Pamela Spiegel and
Lisa Spiegel.*

Philip C. Landrigan and Peter D. Aufrichtig, McCarthy Fingar LLP, White Plains, New York, *for Defendants-Appellees Kamal Chopra, Joe Elbaz and Tishcon Corp., a/k/a Tishcon Corporation.*

Paul B. Sweeney and Barry S. Cohen, Certilman Balin Adler & Hyman, LLP, East Meadow, New York, *for Defendant-Appellee Equity Share I Associates.*

John Gregory Martin and Suzanne M. Avena, Garfunkel Wild, P.C., Great Neck, New York, *for Defendants-Appellees Arkwin Industries, Inc., William Maglio, as Executor of the Last Will and Testament of, and duly authorized Administrator of the Estate of, defendant Daniel Berlin, Frank Jacobson, as Executor of the Last Will and Testament of, and duly authorized Administrator of the Estate of, defendant Daniel Berlin, Thomas Malloy.*

Charlotte A. Biblow and Franklin C. McRoberts, Farrell Fritz, P.C., Uniondale, New York, *for Defendants-Appellees Grand Machinery, Inc. and 2632 Realty Development Corporation.*

Michael S. Cohen, Nixon Peabody LLP, Jericho, New York, *for Defendants-Appellees William Gross and C&O Realty Co.*

Miriam Villani, Sahn Ward Coschignano & Baker, PLLC, Uniondale, New York, *for Defendants-Appellees Audie Kranz, Wilbur Kranz, New Equities, Inc., and Utility Manufacturing Co., Inc.*

Thomas R. Smith, Bond, Schoeneck & King, PLLC, Syracuse, New York, *for Defendant-Appellee Barouh Eaton Allen Corp.*

Kenneth L. Robinson, Robinson & Associates, P.C., Syosset, New York, and Theodore Warren Firetog, Law Offices of Theodore W. Firetog, Farmingdale, New York, *for Defendants-Appellees Richard Degenhart, Atlas Graphics, Inc., and H.D.P. Printing Industries Corp.*

Robert R. Lucic, John E. Peltonen, and Daniel K. Fink, Sheehan Phinney Bass & Green, P.A., Manchester, New Hampshire, *for Defendants-Appellees IMC Eastern Corporation, f/k/a IMC Magnetics Corp., and NMB (USA) Inc.*

Sheila A. Woolson, Epstein Becker & Green, P.C., Newark, New Jersey, *for Defendant-Appellee Island Transportation Corporation.*

Richard P. O'Leary, McCarter & English, LLP, New York, New York, *for Defendant-Appellee Sulzer Metco (US) Inc.*

_____

CHIN, *Circuit Judge*:

In this case, the State of New York (the "State") sued defendants-appellees under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq*. ("CERCLA"), to recover certain

- 7 -

costs incurred in investigating and addressing groundwater contamination in the Town of Hempstead (the "Town") in Nassau County, caused by pollution emanating from the New Cassel Industrial Area (the "NCIA").

The district court (Feuerstein, *J.*), adopting a report and recommendation of the magistrate judge (Orenstein, *M.J.*), granted defendants' motion for summary judgment and dismissed the action as time-barred. The district court held that the State's claims were barred by the six-year statute of limitations governing suits to recover costs for *remedial* actions -- that is, measures to permanently remediate hazardous wastes -- set forth in 42 U.S.C. § 9613(g)(2)(B). That statute of limitations is triggered by the commencement of cleanup construction, and as the district court found that construction began more than six years before suit was brought, the district court held the action was time-barred.

The State argues that the cleanup activities in question are *removal* actions -- that is, measures taken to address immediate threats to public health -- and that suits to recover costs for removal actions are governed by the three-year statute of limitations set forth in 42 U.S.C. § 9613(g)(2)(A), which is triggered by the completion of the removal action. The State contends that because the

removal measures here had not been completed when this action was brought, the statute of limitations had not yet begun to run.

We agree that the State's action is timely. We hold that the cleanup activities here were implemented as removal measures and continued to be removal measures at all relevant times. Accordingly, the district court erred in applying the statute of limitations for remedial rather than removal actions, and we vacate and remand for further proceedings consistent with this opinion.

*STATEMENT OF THE CASE*

*A.     The Contamination and Investigation*

The NCIA, a 170-acre site in North Hempstead, New York, sits on top of a sole source aquifer[1] in which groundwater flows approximately 55 to 65 feet below the ground surface. In the early 1950's, the NCIA was home to a variety of light industries. A number of these industries were involved in

---

[1]     A sole or principal source aquifer is an aquifer that supplies at least 50 percent of the drinking water consumed in the area overlying the aquifer. *See* Sole Source Aquifer Protection Program, Envtl. Protection Agency, http://water.epa.gov/infrastructure/ drinkingwater/sourcewater/protection/solesourceaquifer.cfm (last visited Sept. 11, 2013).

activities that produced volatile organic compounds ("VOCs"), which eventually found their way into the groundwater.[2]

In 1986, the Nassau County Department of Health (the "County Health Department") uncovered groundwater contamination at the NCIA. As a consequence, in 1988 the New York State Department of Environmental Conservation (the "DEC") listed the NCIA as a Class 2 Site on the State registry of hazardous waste sites.[3]

### 1. The GAC

In 1989, the Town detected VOCs in two of its water supply wells at levels approaching New York State Maximum Contaminant Levels for drinking water.[4] These wells were located in the Bowling Green Estates Water District and were approximately 1,500 feet from the NCIA in the direction of the flow of

---

[2] The presence of elevated VOCs in drinking water is a health risk because some VOCs are carcinogens and others may harm certain human organs. *See* Barbara L. Rowe et al., *Occurrence and Potential Human-Health Relevance of Volatile Organic Compounds in Drinking Water from Domestic Wells in the United States*, 115 Envtl. Health Persp. 539, 1539 (2007).

[3] Class 2 sites contain hazardous waste that poses "a significant threat to public health or the environment." N.Y. Comp. Codes R. & Regs. tit. 6, § 375-2.7(b)(3)(ii).

[4] "Maximum Water Contaminant Level" is defined as "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system." N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.1(ap).

groundwater. The Town hired Dvirka and Bartilucci ("D&B"), an engineering firm, to investigate. In November 1989, D&B confirmed the presence of VOCs in the water, including trichloroethylene and tetrachloroethylene, likely carcinogens, and recommended the installation of a granulated activated carbon adsorption system (the "GAC") to remove the VOCs. A GAC eliminates contaminants by pumping untreated water from the wells through carbon units and discharging the water into a groundwater storage reservoir. As the carbon bed reaches its useful adsorption capacity, however, its effectiveness diminishes considerably.

In the fall of 1990, the Town bought and installed a GAC at the site of the two wells. On June 15, 1993, the County Health Department approved the GAC for full operation. The GAC commenced operations, and it has remained in operation since.

**2. The Air Stripper Tower**

From December 10, 1990 through May 30, 1995, the Town found that rising concentrations of VOCs had "markedly increased" the cost of running the GAC system. As Hempstead Water Commissioner Daniel Davis ("Commissioner Davis") explained:

During this period [from December 1990 through May 1995], I became concerned that the increasing concentrations of VOCs would soon render the GAC Treatment System ineffective and too costly or impractical to operate. My concerns led me to consider supplementing the GAC Treatment System in order to improve efficiency and lower the costs of operation.

(Davis Decl. ¶ 16). Commissioner Davis asked D&B to recommend a system to supplement the GAC. In May 1995, D&B proposed an air stripper tower -- a packed tower aeration system. The air stripper tower, which rests on a large concrete slab, treats the water before it is collected in a clearwell and then pumps the water to the GAC.

On June 12 and 13, 1995, the Town took exploratory soil borings to determine whether the soil could bear the weight of an air-stripper tower. The Town awarded the contract to construct the air stripper tower in July 1995. Construction began in July 1995 and was completed in 1997. The air tower commenced operations, and it has remained in operation since.

### 3. The DEC Investigation

The DEC began its remedial investigation of the NCIA in 1995, and thereafter it sampled 41 groundwater monitoring wells between 1996 and 2000,

installed four early warning groundwater wells in 1998, and collected soil and groundwater samples in 1998 and 1999.

On May 16, 1995, the DEC and the New York State Department of Health (the "State Health Department") held a public meeting in Hempstead to address the groundwater contamination. Based on discussions at that meeting, the Town began to suspect the NCIA was the source of the groundwater contamination.

On May 23, 1995, the Town followed up with a letter to the DEC: (1) expressing concern about the "substantial increase in the levels of contamination" in the wells since 1992; (2) requesting consideration for funding for treatment under the New York State Superfund Program; (3) requesting a "full, immediate and intensive investigation by the DEC to determine who all the polluters are so that they will be held accountable for their actions"; and (4) declining to seek compensation for the GAC system already in place.

In 1999, engineers hired by the DEC confirmed the existence of three VOC plumes migrating underground from the NCIA towards the Town. In September 2000, the DEC issued its final remedial investigation/feasibility study report. The report divided the remedial strategy into three parts, and separated

the NCIA into three corresponding operable units addressing ground-level contamination within the NCIA, contaminated groundwater directly beneath the NCIA, and the migration of VOC plumes from the NCIA offsite.

In October 2003, the DEC issued the final Record of Decision ("ROD") selecting a permanent remedy to address the pollution at the NCIA: "Full Plume Remediation of Upper and Deep Portions of the Aquifer (to 225 ft below ground surface) with In-Well Vapor Stripping/Localized Vapor Treatment." This remedy involved pilot testing, the removal of contaminated soil, the construction of additional in-well vapor stripping wells (groundwater circulation wells), as well as the installation of new monitoring wells and a long-term groundwater monitoring program. It also incorporated the existing GAC and air stripper tower. The DEC estimated the full remediation would cost $3.5 million and take seven years.[5]

4.      **Tolling Agreements**

The State entered into tolling agreements with a number of potentially responsible parties -- owners and operators of facilities within the

---

[5]      The project has not yet been completed, and the United States Environmental Protection Agency has taken over responsibility for the NCIA.

- 14 -

NCIA -- tolling the statute of limitations. The earliest of these agreements came into effect on June 27, 2001.

**B.**     *Procedural History*

On March 13, 2006, the State filed this cost-recovery suit against defendants pursuant to section 107 of CERCLA, 42 U.S.C. § 9607, which permits recovery of "all costs of removal or remedial action incurred by the United States Government or a State." The State seeks to recover for costs incurred in investigating and responding to the off-site groundwater contamination at the NCIA, as well as "past, present, and future response costs incurred and to be incurred by the State in responding to releases of hazardous substances." Second Am. Compl. ¶¶ 146, 147. [6]

On September 24, 2010, the magistrate judge issued a report and recommendation ("R&R") recommending that defendants' motion for summary judgment be granted on the grounds that the State's claims were barred by the

---

[6]     On March 23, 1998, the Town of Hempstead formally requested reimbursement from the DEC for the cost of construction of the tower. In 2000, the DEC and the Town entered into an agreement whereby the DEC would reimburse the Town for the cost of constructing and installing the tower, while the Town would own, maintain, and operate it. As it acknowledged in its briefs and at oral argument, the State is not seeking compensation for the GAC because the Town did not seek reimbursement for the GAC from the State.

statute of limitations. *State of New York v. Next Millenium Realty, LLC*, No. CV-06-1133, 2010 WL 8032748 (E.D.N.Y. Sept. 24, 2010). The district court adopted the R&R in its entirety by order dated November 22, 2011.

The district court concluded that the GAC and the air stripper actions were "remedial" and that the actions were attributable to the State. It held that the State's claims were subject to the statute of limitations for remedial actions, which bars claims filed more than six years after commencement of construction. The district court then concluded that the statute had begun to run either when the GAC was installed in 1990, or when three foundational borings for the air stripper were drilled on June 12 and 13, 1995. *Next Millenium*, 2010 WL 8032748, at *12-13. Because the earliest tolling agreement did not come into effect until June 27, 2001 -- more than six years after construction commenced on June 12, 1995 -- the district court ruled the State's suit, filed on March 13, 2006, was time-barred. *Id.* at *14.

This appeal followed.

### DISCUSSION

**A. CERCLA**

Congress created CERCLA to address hazardous waste spills by authorizing the United States and the States to commence cleanup with public

- 16 -

money and then to seek the recovery of costs from polluters. 42 U.S.C. § 9607(a)(4)(A). Congress deliberately structured this regime to allow federal and state governments to respond to spills immediately while leaving the determination of liability and financial responsibility for later. *See, e.g., New York v. Shore Realty Corp.*, 759 F.2d 1032, 1041 (2d Cir. 1985) ("EPA can sue for reimbursement of cleanup costs from any responsible parties it can locate, allowing the federal government to respond immediately while later trying to shift financial responsibility to others." (citation omitted)).

We have construed CERCLA liberally to advance the dual goals of cleaning up hazardous waste and holding polluters responsible for their actions. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992) ("Because it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup."); *Prisco v. A&D Carting Corp.*, 168 F.3d 593, 602 (2d Cir. 1999) ("As a remedial statute, CERCLA should be construed liberally to give effect to its purposes." (quoting *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir. 1996) (internal quotation marks omitted)).

Section 107 of CERCLA authorizes federal and state governments to recover response costs from potentially responsible parties ("PRPs") for both removal and remedial actions. 42 U.S.C. § 9607(a)(4)(A). Removal actions are clean-up or removal measures taken to respond to immediate threats to public health and safety. 42 U.S.C. § 9601(23)[7]; *see also Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998) (removal actions are those "taken to counter imminent and substantial threats to public health and welfare"); *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1244 (9th Cir. 2005) ("Courts have

---

[7]     42 U.S.C. § 9601(23) provides:

> The terms "remove" or "removal" mean[] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 *et seq.*].

- 18 -

. . . stressed the immediacy of a threat in deciding whether a cleanup is a removal action." (collecting cases)). *Accord* Memorandum from Stephen Luftig, Director, Office of Emergency and Remedial Response, Use of Non-Time Critical Removal Authority in Superfund Response Actions, to Regions I-X Program and Legal Division Directors (Feb. 14, 2000) (emphasizing immediate nature of removal actions), *available at* http://www.epa.gov/superfund/policy/remedy/ pdfs/memofeb 2000-s.pdf (the "EPA Guidance").[8]

Remedial actions are generally actions designed to permanently remediate hazardous waste. 42 U.S.C. § 9601(24)[9]; *see also Schaefer v. Town of*

---

[8] While the EPA Guidance is not entitled to the level of deference afforded by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), it is entitled to some deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 140 (1944) (rulings, interpretations, opinion letters, policy statements, agency manuals, and enforcement guidelines are "entitled to respect" to the extent they possess the "power to persuade"); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 487-88 (2004) (although internal agency guidance memoranda do not receive *Chevron* deference, "[c]ogent 'administrative interpretations . . . not [the] products of formal rulemaking . . . nevertheless warrant respect.'" (alterations in original and citations omitted)). In *United States v. W.R. Grace & Co.*, the Ninth Circuit gave some deference to the EPA Guidance in determining that an action was removal and not remedial in nature. 429 F.3d 1224, 1243 (9th Cir. 2005).

[9] 42 U.S.C. § 9601(24) provides in part:

The terms "remedy" or "remedial action" mean[] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of

*Victor*, 457 F.3d 188, 195 (2d Cir. 2006) (remedial actions are "generally long-term or permanent containment or disposal programs") (quoting *Shore Realty Corp.*, 759 F.2d at 1040 (internal quotation marks omitted)); *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 667 (9th Cir. 2004) ("remedial actions generally are permanent responses") (quoting *Geraghty and Miller, Inc. v. Conoco, Inc*, 234 F.3d 917, 926 (5th Cir. 2000) (internal quotation marks omitted)).

Removal and remedial actions are governed by different statutes of limitations. For removal actions, the government must seek to recoup costs within three years "after completion of the removal action." 42 U.S.C. § 9613(g)(2)(A). For remedial actions, the government must seek to recoup costs

a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contamination materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

within six years after "initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). [10]

Whether a suit to recover response costs under section 107 of CERCLA is a "removal action" or a "remedial action" is a question of law that we review *de novo*. *W.R. Grace & Co.*, 429 F.3d at 1234-35 ("Whether the . . . cleanup activity was a removal action -- or, on the other hand, a remedial action in removal action's clothing -- is a question of statutory interpretation" and thus, "a legal issue that we review as a matter of law."); *Geraghty and Miller, Inc.*, 234 F.3d at 925-26 (classification of an activity as "removal" or "remedial" is "determined as a matter of law"). Likewise, to the extent the resolution of this legal question turns on factual issues, we review the district court's grant of summary judgment *de novo*, applying well-settled principles governing summary judgment motions. *Lopes v. Dep't of Soc. Servs.*, 696 F.3d 180, 184 (2d Cir. 2012).

**B.** *Analysis*

We hold that, to the extent it concerns the GAC and air stripper tower, this suit is a "removal action" subject to the three-year statute of limitations, which is triggered by the "completion of the removal action."

---

[10] Section 9613(g)(2)(B) further provides that any "costs incurred in the removal action may be recovered in the cost recovery action" for the remedial action, "if the remedial action is initiated within 3 years after the completion of the removal action."

Because the removal measures cannot be deemed to have been completed in any sense before the State's adoption of a remediation plan that incorporated them, and this action was commenced within three years of that earliest possible date, the statute of limitations had not run as of the time this action was commenced. Hence, we hold that the district court erred in dismissing this action as untimely.

### 1.    The Nature of the Cleanup Measures

We hold that the GAC and air stripper tower were removal measures, for the following reasons.

First, both systems were installed in response to an imminent public health hazard, a defining characteristic of removal actions. *See Kalman W. Abrams Metals, Inc.*, 155 F.3d at 1024; *W.R. Grace & Co.*, 429 F.3d at 1244 (collecting cases). The contamination in Hempstead's drinking water posed an immediate threat. As the engineering firm D&B recognized in its November 1989 report:

> Wells 1 and 2 at the Iris Place Pump Station have Volatile Organic Compound (VOC) concentrations approaching current New York State Maximum Contaminant Levels for potable water.  The wells are critical to the operation of the Bowling Green Water District; consequently, *immediate* action is required to ensure that the wells remain operational at all times.

(Aff. of Daniel Davis, Ex. 1 at 3) (emphasis added). The Town installed the GAC in response to this impending substantial threat to public health.

Similarly, the Town constructed the air stripper tower in direct response to rising VOC levels that were overwhelming the GAC system and diminishing its effectiveness. After Commissioner Davis grew concerned that the increasing levels of VOCs would "render the GAC Treatment System ineffective and too costly or impractical to operate," he issued a directive to carry out design work for the air stripper tower to ensure that the Bowling Green wells would be "capable of supplying adequate quantities of potable water to customers in accordance with the New York State Sanitary Code." (Davis Decl. ¶¶ 16, 17). There is no question these two measures were taken by the Town in response to concerns about the imminent threat to safe drinking water.

Second, both the GAC and the air stripper tower were designed as measures to address water contamination at the endpoint -- the wells -- and not to permanently remediate the problem by "prevent[ing] or minimiz[ing] the release of hazardous substances so that they do not migrate" from the underlying source of contamination at the NCIA. 42 U.S.C. § 9601(24); *see W.R. Grace & Co.*, 429 F.3d at 1247 (finding cleanup activity to be removal action where it did not

"fully eliminate the public health threat or amount to a full-blown remediation");
*see also City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1213 (E.D. Wash.
2006) (cleanup action taken by the City at drinking wells to lower TCE amounts
to below maximum contaminant levels -- rather than abating the contamination
in the aquifer or at the Superfund site proper -- bears "all of the hallmarks of a
'removal action' --  an interim response to minimize and stabilize imminent
harms to human health").  Indeed, at the time the GAC and air stripper were
built, neither the State nor the Town knew the source of the VOCs in the drinking
water pumped from the wells, and they were responding to a water-supply
problem, not an environmental cleanup concern.  The contaminated water was
already in the wells, and the water came out of the wells into the GAC and air
stripper tower so that the contaminants could be removed from the wells.  These
were not remedial measures intended to prevent the well water from being
contaminated in the first place.

The GAC and air stripper tower were implemented as measures to
minimize and mitigate the damage from the NCIA, rather than to permanently
eliminate it.  *See* 42 U.S.C. § 9601(24) ("remedial" action defined as "those actions
consistent with permanent remedy").  Neither project was designed to remedy

the underlying source of the contamination, namely, the hazardous waste at the NCIA. Indeed, the fact that the VOCs were migrating from the NCIA was not even confirmed until 1999 -- nine years after the GAC was built and four years after the air stripper tower was built. Therefore, the Town's actions in 1990 and 1995 could not have been intended to permanently remediate the contamination coming from the NCIA.[11] It was not until October 2003 that the State, having conducted lengthy studies and considered a number of alternatives, determined that a number of new cleanup measures throughout the NCIA site, along with the existing GAC and air stripper tower, would be appropriate means of remediating the contamination coming from the NCIA.

Defendants argue that cleanup actions do not have to address the underlying source of contamination to qualify as "remedial," citing *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594 (8th Cir. 2011). In *Morrison*, the City of Hastings, Nebraska, removed contaminated wells and installed new wells and

---

[11] Defendants point to evidence that Commissioner Davis stated that the GAC "was not intended to be a temporary system," that the intent was "to construct a system that would permanently address the contamination found in the Bowling Green wells." Even so, as discussed further below, the GAC was not a permanent remediation in the sense that it did not address the source of the contamination -- the VOC plumes migrating from the NCIA. Moreover, even though the GAC eventually became a part of the permanent solution, as discussed below, it could still also qualify as a removal action during the relevant time period for purposes of the statute of limitations.

water mains to remediate contaminated drinking water. *Id.* at 600. The City argued that these actions were removal measures because "the work on the water supply system did not clean one molecule of water or rid the environment of any contamination whatsoever." *Id.* at 608 (internal quotation marks omitted). The Eighth Circuit disagreed, holding that "retiring contaminated wells and obtaining uncontaminated supplies of water to meet the needs of the City's residents for the foreseeable future is more in the nature of a permanent remedy." *Id.* In doing so, it relied on the fact that the phrase "provision of alternative water supplies" is found in the definition of "remedial" actions. *Id.* at 609; *see* 42 U.S.C. § 9601(24). The court noted:

> [t]he City's narrow interpretation of the term remedial action would render Congress's specific inclusion of the provision of alternative water supplies in the second sentence of the definition a nullity. By its inherent nature, the provision of alternative water supplies never cleans contaminated water, nor rids the environment of contamination.

*Morrison*, 638 F.3d at 609. Thus, because the measures constituted the "provision of alternative water supplies" and were consistent with the definition of "remedy," which includes actions to "prevent or minimize the release of hazardous substances," the court concluded they were remedial.

- 26 -

In contrast, the Town's actions in this case do not involve the provision of alternative water supplies. The GAC and air stripper tower were used to remove sufficient amounts of contamination from polluted water to render the water safe to drink. That is hardly the same as retiring contaminated wells and building an entirely new water supply system. Thus, *Morrison* is inapposite.

Additionally, even though the GAC and the air stripper tower eventually were ultimately adopted as part of a permanent remedial solution, they still constituted "removal" actions at all times relevant to the statute of limitations question. *W.R. Grace & Co.*, 429 F.3d at 1244 ("As a practical matter, removal actions are often permanent solutions such as can be the case in a typical soil or drum removal.") (quoting EPA Guidance at 3 n. 3 (internal quotations marks omitted)); *Geraghty and Miller, Inc.*, 234 F.3d at 927 ("Even if the replacements for these wells are integral to the long-term remediation of the site, that does not mean that their initial placement cannot be categorized as removal."). Likewise, even if the GAC and the air stripper tower performed certain functions that might be considered "remedial," such as "prevent[ing] or minimiz[ing] the release of hazardous substances so they do not migrate to cause

- 27 -

substantial danger to present or future public health or welfare," 42 U.S.C. § 9601(24) (definition of remedy), that does not preclude them from being classified as "removal." *Geraghty and Miller, Inc.*, 234 F.3d at 927 (noting there can be overlap between remedial and removal activities); *Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.,* 920 F.2d 1415, 1419 (8th Cir. 1990) (finding excavation to be a removal activity even though CERCLA lists it as a remedial activity), *abrogated on other grounds by Key Tronic Corp. v. United States*, 511 U.S. 809 (1994).

Thus, we conclude, as a matter of law, that under the circumstances of this case, these two systems, which were built in response to an immediate health threat and designed to render the drinking water safe without addressing the underlying source of pollution, were "removal" and not "remedial" actions at least up until the time that the State adopted a remediation plan that incorporated them.[12]

---

[12] We need not, and do not, hold that all GAC systems, or all air stripper towers, necessarily constitute removal actions no matter the circumstances under which they are implemented. An air stripper tower, for example, could be constructed with the understanding that it would constitute a permanent solution to the relevant water safety issue, or, where the underlying source or pollution is known, with the understanding that it would address the source of the pollution. Nothing in this opinion prevents consideration of these or other factors on a case-by-case basis to determine whether a given air stripper tower or GAC system constitutes a removal or a remedial action under CERCLA. Nor do we hold that such a removal measure automatically terminates as such at the moment a larger remedial plan incorporating it

## 2. Defendants' remaining arguments

### a. The duration and cost of the actions

Defendants argue that the duration and cost of these measures indicate they are remedial actions. They point out that the GAC has been running since 1990 and the air stripper tower since approximately 1997. They also argue that the cost of the projects -- the GAC cost $1.25 million and the air stripper tower cost $1.2 million -- supports the conclusion that these are remedial actions because they are simply too expensive to be removal actions.

In support of their argument, the defendants point to a section of CERLCA that provides that a removal measure "shall not continue after $2,000,000 has been obligated for response actions or 12 months has elapsed from the date of initial response." 42 U.S.C. § 9604(c)(1); *accord* 40 C.F.R. § 300.415(b)(5). There are, however, two exceptions to this cap: (1) if there is an "immediate risk to public health or welfare or the environment" requiring "continued response actions" to "prevent, limit, or mitigate an emergency," or (2) if the "[c]ontinued response action is otherwise appropriate and consistent with

---

is adopted. It is sufficient for the instant analytical purpose to note that the removal status of the GAC and air stripper tower measures here ended, if at all, no earlier than the date the State adopted its remedial plan, and that the State's cost recovery action is therefore timely.

the remedial action to be taken." 42 U.S.C. § 9604(c)(1); *accord* 40 C.F.R.

§ 300.415(b)(5)(i) and (ii).

As an initial matter, defendants concede that "these limits are not binding here since the State performed the response measures," rather than the federal government. Defs.-Apps.' Br. at 34. In addition, the GAC and air stripper tower fall within both exceptions as there was an "immediate risk to public health" and the "continued response actions" were required to "prevent, limit, or mitigate an emergency." 42 U.S.C. § 9604(c)(1); *accord* 40 C.F.R. § 300.415(b)(5)(i) and (ii). The Town instituted these measures in response to rising levels of VOCs that posed a serious threat to drinking water safety. Accordingly, the limitations of 42 U.S.C. § 9604(c)(1) are not applicable. *See W.R. Grace*, 429 F.3d at 1226, 1249 (holding district court did not err in determining action was removal even though it cost over $54 million and took several years to complete because there was an immediate risk to public health).

Moreover, the EPA Guidance persuasively provides that neither the cost nor the duration of a project is dispositive in determining whether the project is removal or remedial:

> While some courts have looked to [the length of time
> necessary to complete an action] in distinguishing

between removal and remedial actions, this characteristic usually is not helpful; removal actions are most often of short duration, but they certainly can be long-running responses, too, thereby undercutting the probative value of duration . . . in deciding whether an action is removal rather than remedial in nature.

EPA Guidance at 3 n.2. The EPA Guidance also recognizes that removal actions can involve considerable expense:

[E]ven expensive and complex response actions may be removal action candidates if they are relatively time-sensitive -- regardless of whether any further action might ultimately be selected for a site.

*Id.* at 4.

Because both the GAC and the air stripper tower were urgent responses designed to combat rising levels of VOCs that threatened the water quality, the duration and cost of these measures do not mean that they constituted remedial actions *ab initio*. *See id.* at 4 n.4 (the $2 million and 12 month limitations "apply only to fund-financed actions, and serve as a fiscal check; they are not found in the statutory definition of 'removal' and do not control which actions can be taken as removals").

### b. The use of the word "remedial" by the State

The district court found that the State's use of the word "remedial" in conjunction with the GAC system and the air stripper tower showed they were remedial measures. Specifically, the State referred to these as "interim remedial measures" and as "remedial" alternatives in the ROD. *Next Millenium,* 2010 WL 8032748, at *11. In addition, in its interrogatory responses, the State referred to "additional remedial measures in order to complete the remediating of Hazardous Substances." [Maldonado Decl. in Supp. of Motion for Summ. J., Ex. 7, at 22]. Finally, defendants contend that Jeff Trad, an engineer at the DEC, on one occasion described the air stripper tower as part of the "remediation" of the groundwater in a conversation with Commissioner Davis.

These generic uses of the word "remedial," however, do not require a finding that the measures were remedial in the statutory sense at the time they were implemeted. The word "remedial" is often used in environmental discussions in its common every day sense, namely, "intended as a remedy." Webster's New Collegiate Dictionary 970 (1980); *see also Geraghty and Miller, Inc.,* 234 F.3d at 926 ("[c]onfusion often results because the industry use of 'remediation' is not synonymous with CERLCA's definition of 'remedial.'"). The

use of the word by itself does not render an action "remedial" for purposes of the statute of limitations. *City of Moses Lake v. United State*s, 416 F. Supp. 2d 1015, 1024 (E.D. Wash. 2005) (use of word "remedial" in a "generic sense" in several documents over a thirteen-year period "do[es] not constitute an admission . . . that this cleanup is now in its 'remedial' phase as opposed to a 'removal' phase" under CERCLA). In its generic sense, "remedy" encompasses both temporary measures to address immediate threats to public health as well as permanent solutions to eliminate sources of contamination. Furthermore, New York law defines "interim remedial measure" to include "activities to address both emergency and non-emergency site conditions," 6 N.Y. Comp. Codes R. & Regs. tit. 6, § 375-1.2(ab), clearly encompassing what would be considered "removal" actions under CERCLA.

In short, the Town's efforts here -- a GAC and an air stripper tower -- were removal measures taken to respond to the immediate health concerns presented by contaminated well water while it investigated the source of the contamination and sought to develop a more coherent and fuller response to eliminate permanently the underlying source of the contamination. This action

was commenced within three years of the State's adoption of a comprehensive remediation plan that incorporated the preexisting removal technologies.

## *CONCLUSION*

For the foregoing reasons, we hold that the cleanup activities at issue were "removal" measures at all relevant times and the State's claims are governed by the three-year statute of limitations. Accordingly, the State's suit is not time-barred and the judgment of the district court is VACATED and this case is REMANDED for further proceedings consistent with this opinion.