In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 18-2633 & 18-2738

VALBRUNA SLATER STEEL CORPORATION, *et al.*,

*Plaintiffs-Appellees, Cross-Appellants*,

*v.*

JOSLYN MANUFACTURING COMPANY, *et al.*,

*Defendants-Appellants, Cross-Appellees*.

---

Appeals from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:10-cv-00044-JD — **Jon E. DeGuilio**, *Judge*.

---

ARGUED MAY 16, 2019 — DECIDED AUGUST 8, 2019

---

Before BAUER, HAMILTON, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. This case is about an on-and-off, dec-ades-long effort to stop an Indiana steel mill's pollution. Val-bruna Slater Steel purchased the mill (or the "site") in 2004, and it quickly got to work on needed, but costly, cleanup ef-forts. Valbruna then sued Joslyn Manufacturing Company, which last operated the site in 1981, to recover costs under both the Comprehensive Environmental Response,

Compensation, and Liability Act (CERCLA) and Indiana's Environmental Legal Actions statute (ELA).

Joslyn's fault is undisputed; its operation of the site started the pollution problems. But Joslyn defended itself in the district court on claim-preclusion, statute-of-limitations, and contribution grounds. The district court decided the CERCLA claim was not precluded, but the ELA claim was. It also decided the suit was timely. The district court, however, did impose equitable contribution on Valbruna, requiring it to pay for a quarter of the past and future costs incurred during the site's cleanup. Joslyn appeals and Valbruna cross-appeals. We affirm across the board.

## I. Background

Joslyn,[1] a steel manufacturer, owned and operated the site, located in Fort Wayne, Indiana, from 1928 to 1981. Joslyn's operation polluted nearby soil, sludge, and, as a result, groundwater. In 1981, Joslyn sold the site to Slater Steels Corporation through an Asset Purchase Agreement. After acquiring the site, Slater set to work with cleanup efforts. Slater did so, the record suggests, upon pressure from regulators and to bring the site into compliance with the Resource Conservation and Recovery Act of 1976. *See* 42 U.S.C. § 6901 *et seq.*

From 1981 to 1987, Slater excavated sludge and contaminated soil from two areas on the site: an impoundment area and a waste pile. The excavation, however, did not remove all contaminates. In 1988, Slater signed an agreement with the

---

[1] We refer to the parties as Joslyn, Valbruna, and Slater. The parties' briefs identify the particular affiliates or corporate entities that were involved in the various transactions and suits, but those corporate distinctions do not matter for our purposes.

EPA, which permitted monitoring of the site until the Indiana Department of Environmental Management (IDEM) could certify the closure of the polluted areas. In 1991, Slater undertook more work, this time capping the excavated impoundment area with a concrete lid to prevent runoff. Slater also implemented a ground-water detection program. IDEM then issued a certification of completion for the work Slater had started, though IDEM recognized that more work was ongoing and necessary at the site.

Slater repeatedly tried to get Joslyn to pay for the cleanup work it had done, to no avail. In 1988 and again in 1994, Slater sent Joslyn a demand letter explaining that Joslyn was responsible for the cleanup under their agreement. Joslyn disagreed, telling Slater that it had assumed responsibility for the costs. Slater escalated its demand in 1999. With another demand letter, it sought costs not just per the agreement, but under CERCLA and the ELA statute as well. Joslyn again declined to pay for the cleanup.

The dispute headed to court. In 2000, Slater sued Joslyn in an Indiana state court seeking (1) indemnification under the agreement and (2) costs under the ELA statute. Slater did not bring a CERCLA claim in its state-court suit—nor could it. Federal courts have exclusive jurisdiction over CERCLA claims. 42 U.S.C. § 9613(b).

Slater's state-law claims ultimately failed. First, in 2001, the trial court ruled that the ELA statute—enacted in 1998—could not be retroactively enforced. (Later, in different litigation, the Indiana Supreme Court supported retroactive application. *See Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1285 (Ind. 2009). But for Slater's purposes, its ELA claim was over.) Then, in 2003, Slater filed for bankruptcy and

stopped cooperating in discovery. When it failed to produce its environmental manager for a deposition, Joslyn moved to dismiss for want of prosecution under Indiana Trial Rule 41(E). The trial court granted that motion in 2005.

In 2004, with the state suit pending, Valbruna purchased the site at a competitive bankruptcy auction. It paid $6.4 million. Before finalizing the deal, and apparently recognizing the ongoing pollution hazards, Valbruna negotiated with IDEM. Valbruna and IDEM agreed to a Prospective Purchase Agreement (PPA). Under the PPA, both parties agreed to put down $500,000 each, the total of which would go toward cleanup if Valbruna won the auction.

After Valbruna won the auction, its purchase contract granted Valbruna the right to intervene in Slater's pending state-court suit. Valbruna never did so. Valbruna, instead, set out to perform more cleanup in 2005, as the PPA required. IDEM approved Valbruna's cleanup plan, but the plan budgeted to (and ultimately would) deplete more than the $500,000 Valbruna set aside. In 2007, with work ongoing, IDEM again reviewed the site, and ordered even more cleanup.

Upset with how much the cleanup cost, Valbruna filed this suit in 2010 against Joslyn in federal court. Valbruna claimed cost recovery pursuant to § 107 of CERCLA, 42 U.S.C. § 9607(a), and the ELA statute, Ind. Code §§ 13-30-9-2–3. Valbruna also sought a declaratory judgment regarding Joslyn's liability. Joslyn counterclaimed for contribution under § 113(f). 42 U.S.C. § 9613(f). Valbruna did not cause the pollution, Joslyn admitted, but under § 107(a)(1), a facility's owner, like Valbruna, may be liable for cleanup costs.

Joslyn moved to dismiss on claim-preclusion grounds, citing the earlier state-court suit between it and Slater. The district court converted that motion to one for summary judgment. It granted the motion with respect to the ELA claim, concluding that Slater and Valbruna were in privity, but it denied the motion on the CERCLA claim. The court explained, in a revised ruling, that because CERCLA is an exclusively federal claim there could be no claim preclusion based on the failure to raise it in an earlier state-court suit.

Joslyn then tried to defeat the CERCLA claim on a different ground. It filed a motion for summary judgment arguing that the claim was time-barred because it was brought more than six years after the start of "remedial action"—Slater's earlier cleanup, according to Joslyn. 42 U.S.C. § 9613(g)(2). The district court disagreed. In a thorough opinion, the district court decided, as a matter of law, that Slater's cleanup was "removal" and therefore the relevant limitations period had not tolled. *Compare id.* § 9613(g)(2)(A) (time limits for removal actions) *with* (B) (time limits for remedial actions). Joslyn attempted to amend its answer, adding the claim-preclusion and statute-of-limitations defenses for which it had already filed summary-judgment motions. The magistrate judge granted Joslyn leave to amend but struck the defenses, concluding that the district court's earlier decisions settled that those defenses did not apply as a matter of law. Joslyn asked for reconsideration, which the magistrate judge denied.

Joslyn was undeterred. It filed another motion for summary judgment, without first seeking leave as the court had told it to. Again, Joslyn argued its already-stricken claim-preclusion and statute-of-limitations defenses. Valbruna then sought a declaration that Joslyn was liable under § 107(a) of

CERCLA. The district court denied Joslyn's successive motion and granted Valbruna's motion, finding that there was no question that Joslyn, as the initial polluter, was liable.

That left only two issues: damages and contribution under CERCLA. The case went to a bench trial in two phases on those issues. As for damages, after trial the district court concluded that Valbruna had incurred $2,029,871.09 in costs while remediating the site. It then reduced that amount by $500,000, believing that it would be unfair for Valbruna to recover that sum twice, as it had been contemplated in Valbruna's purchase price and the PPA. As for contribution, the district court apportioned liability for past and future costs: 75% for Joslyn, 25% for Valbruna. The district court justified Valbruna's share by citing its assumed risk in purchasing an old metal-production site with well-known pollution problems.

Joslyn appealed and Valbruna cross-appealed.

## II. Discussion

The parties on appeal continue their dispute over who should pay what for the site's costly clean up. The answer turns on issues of preclusion, timeliness, and the district court's discretion in equitably allocating costs. We will address those issues and the parties' appeals in turn.

### A. Joslyn's Appeal

Joslyn argues two reasons why Valbruna's cost-recovery claim under CERCLA should fail: it is precluded by the earlier state-court suit and it is untimely. Before addressing those arguments, we must pass a procedural hurdle.

This is how the litigation over Joslyn's defenses should have played out: Joslyn timely pleaded its preclusion and limitations defenses; the parties cross-moved at summary judgment on those defenses; and the district court, concluding, as it did, that the defenses did not apply as a matter of law, granted Valbruna summary judgment on the defenses. No doubt we could review that (hypothetical) grant of summary judgment after the final judgment. *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990). But things played out differently. Joslyn did not plead the defenses before moving for summary judgment on them, and so Valbruna never cross-moved on them (it just opposed Joslyn's motion). As a result, Joslyn now wants us to review the district court's *denial* of its motions for summary judgment on the preclusion and limitations defenses.

That request gives us pause, though, because we do not typically review summary-judgment denials. After a case goes to trial, as happened here, an earlier summary-judgment denial is "old news." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019); *see also Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). We have noted a possible exception to that rule of non-reviewability, for "purely legal issues." *Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865, 869 (7th Cir. 2018); *see also Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 404 (7th Cir. 2018) (discussing the "controversial exception"); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 n.2 (7th Cir. 2015) (noting "a split of authority on this point"). This case arguably fits into this possible exception. The facts are undisputed and the district court's preclusion and limitations decisions were as a matter of law.

We, however, need not decide as much to hear Joslyn's appeal. Despite Joslyn's focus on the summary-judgment denials, Joslyn's defenses were finally put to bed by a different order—the order striking the defenses from the amended answer.[2] The decision to strike, which incorporated the earlier summary-judgment reasoning, was a dispositive order on the defenses, which we can review. *See Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 563 (7th Cir. 2018). Because the defenses failed in the district court as a matter of law, our review is de novo. *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 384 (7th Cir. 2019).

### 1.  CERCLA Claim Preclusion

Claim preclusion, or res judicata, generally bars the relitigation of claims that were brought, or could have been brought, in an earlier suit that has reached final judgment. The district court here concluded that the state-court suit did not preclude the CERCLA claim. To decide the preclusive effect of a state-court judgment, and in the interest of affording full faith and credit to state-court judgments, 28 U.S.C. § 1738, we look to the law of the state where the judgment occurred. *Mains v. Citibank, N.A.*, 852 F.3d 669, 675 (7th Cir. 2017). That state here is Indiana.

Under Indiana law, the following four elements must be met for claim preclusion to apply:

> (1) the former judgment must have been rendered by a court of competent jurisdiction; (2) the former judgment must have been rendered on the merits; (3) the matter now in

---

[2] This is true despite Joslyn's later attempt to resuscitate the defenses with another summary-judgment motion, which, again, it filed without leave from the court.

issue was, or could have been, determined in the prior ac-
tion; and (4) the controversy adjudicated in the former ac-
tion must have been between the parties to the present suit
or their privies.

*Freels v. Koches*, 94 N.E.3d 339, 342 (Ind. Ct. App. 2018). We
begin and end with the first element, regarding jurisdictional
competency.

Cost-recovery actions under CERCLA, as we noted earlier,
can only be brought in federal court. 42 U.S.C. § 9613(b). The
question, then, is whether an Indiana court has jurisdictional
competency over an exclusively federal claim. Indiana courts
have not answered the question—nor will they. State courts
do not hear exclusively federal claims, by definition, and so
the question will not come before them.[3] *Matsushita Elec. In-
dus. Co. v. Epstein*, 516 U.S. 367, 375 (1996); Wright & Miller,
18B Fed. Prac. & Proc. § 4470.1 (2d ed. 2019). So our task is to
answer the question "in the same way (as nearly as we can
tell) as the state's highest court would." *Newman v. Metro. Life
Ins. Co.*, 885 F.3d 992, 1000 (7th Cir. 2018).

The starting point is *Marrese v. Am. Acad. of Orthopaedic
Surgeons*, 470 U.S. 373 (1985). In *Marrese*, the Supreme Court
held that in deciding whether res judicata bars an exclusively
federal claim (there, a Sherman Act claim), federal courts
must look to state law. En route to that holding, the Court
noted that, under most state law, "claim preclusion generally
does not apply where '[t]he plaintiff was unable to rely on a
certain theory of the case or to seek a certain remedy because

---

[3] With one exception: a state supreme court could, of course, answer
the question if we were to certify it. *See* Ind. R. of App. P. 64. Joslyn, how-
ever, expressly disavowed any request to certify the question to the Su-
preme Court of Indiana at oral argument.

of the limitations on the subject matter jurisdiction of the courts.'" *Id.* at 382 (quoting Restatement (Second) of Judgments § 26(1)(c) (1982)). The Court elaborated, if "state preclusion law includes this requirement of prior jurisdictional competency, which is generally true, a state judgment will *not* have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts." *Id.* (emphasis in original). Based on this general rule, the Court saw no need to carve out an exception to the Full Faith and Credit statute, and the deference to state judgments that it requires, for exclusively federal claims that are brought after a state judgment. Such claims will usually not be precluded under state law, the Court reasoned. *Id.* at 382–83 & n.3.

The Restatement (Second) of Judgments § 26, which *Marrese* quotes, is equally explicit about the general rule. It states: "When the plaintiff brings an action in the state court, and judgment is rendered for the defendant, the plaintiff is not barred from an action in the federal court in which he may press his claim against the same defendant under the federal statute." The Restatement then offers Illustration 2, which *Marrese* also cites, 470 U.S. at 383, and it offers clarification by hypothetical:

> A Co. brings an action against B Co. in a state court under a state antitrust law and loses on the merits. It then commences an action in a federal court upon the same facts, charging violations of the federal antitrust laws, of which the federal courts have exclusive jurisdiction. The second action is not barred.

Restatement (Second) of Judgments § 26(c)(1). Federal courts make the same point. Following *Marrese* and the Restatement, they recognize that if state law requires jurisdictional

competency for res judicata purposes, state judgments do not preclude exclusively federal claims. *See United States v. B.H.*, 456 F.3d 813, 817 (8th Cir. 2006) (Iowa law); *In re Lease Oil Antitrust Litig. (No. II)*, 200 F.3d 317, 320–21 (5th Cir. 2000) (Alabama law); *Valley Disposal, Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 31 F.3d 89, 98 (2d Cir. 1994) (Vermont law); *Pension Tr. Fund For Operating Eng'rs v. Triple A Mach. Shop, Inc.*, 942 F.2d 1457, 1461 (9th Cir. 1991) (California law); *Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 662–64 (6th Cir. 1990) (Ohio law); *McCarter v. Mitcham*, 883 F.2d 196, 199–200 (3d Cir. 1989) (Pennsylvania law); *Cullen v. Margiotta*, 811 F.2d 698, 732 (2d Cir. 1987) (New York law), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987).

Would the Supreme Court of Indiana apply the general rule that *Marrese* describes, the Restatement adopts, and federal courts have ascribed to other states' law? We hold that it would. Indiana's res judicata elements include the jurisdictional-competency requirement, which was the basis for *Marrese*'s general rule. More, the Supreme Court of Indiana has already cited *Marrese*'s general rule approvingly.

*Green v. Hendrickson Publishers, Inc.*, 770 N.E.2d 784, 791 (Ind. 2002), addressed an exclusively federal counterclaim under copyright law. 42 U.S.C. § 1338(a). It explained:

> [W]e agree [with the lower court] that claim preclusion could prevent the Greens from presenting their [counter] claim in a separate suit. *We do not agree that that would be the case if the state court had no jurisdiction over the Greens' counterclaim.* Although it is true that the subject matter of the Greens' counterclaim and the as yet unfiled federal copyright claim are logically related and presumably arise out of the same "transaction or occurrence," if the state court had

> no jurisdiction over the subject matter of the counterclaim,
> it cannot be "compulsory."

770 N.E.2d at 791 n.2 (citing *Marrese*, 470 U.S. at 382, quoting in turn Restatement (Second) of Judgments § 26(1)(c)) (emphasis added). This is the rule *Marrese* describes: if there is no state-court jurisdiction to hear an exclusively federal claim, there is no claim preclusion.

Joslyn submits that *Green*'s adoption of the rule was dicta. But we cannot ignore it. Dicta from a state supreme court is good evidence of how the court would decide an issue it has not yet directly encountered. *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 467 (7th Cir. 1997). That is especially true in this case. As we noted earlier, state courts have no "occasion" to answer the question we face. *Marrese*, 470 U.S. at 381–82. Absent certification (which Joslyn disavows), dicta offers the clearest insight into how the court would rule here.

Plus, *Green's* approval of *Marrese* and Restatement § 26 was considered. *Green* concerned, in part, whether a copyright counterclaim was "compulsory" such that it had to be brought in the state-court action. This question is intertwined with preclusion, as *Green* recognized, because if a claim is compulsory it is later precluded if not raised. *See also Publicis Commc'n v. True N. Commc'ns Inc.*, 132 F.3d 363, 365 (7th Cir. 1997). *Green* dropped the footnote approving *Marrese* and Restatement § 26 to correct the Indiana appellate court's misunderstanding of these related issues. *See* 770 N.E.2d at 791 n.2. If, as *Green* held, a federal counterclaim was not exclusively federal, it could be compulsory in state court and later precluded if not raised. *See id.* at 791–92 & n.2. It follows, as *Green* noted, that if the counterclaim was exclusively federal—like

the CERCLA claim here—it is not compulsory and not subject to claim preclusion. *See id.* at 791 n.2.

Joslyn also attempts to distinguish *Green* on procedural grounds, noting that it involved a defendant's counterclaim and not, as here, a plaintiff's claim. That distinction does not undermine *Green*'s persuasiveness. *Green* remains Indiana's only treatment of whether earlier state-court judgments bar exclusively federal claims. It indicates that they cannot be claim precluded.

*Green* notwithstanding, Joslyn submits that the Supreme Court of Indiana would in fact find res judicata here because Indiana, like most states, disapproves of claim splitting. *See, e.g.*, *Erie Ins. Co. v. George*, 681 N.E.2d 183, 189–90 (Ind. 1997). *Marrese* considered a similar problem and found it unavailing. Despite the general prohibition on claim splitting, the Court explained, "the jurisdictional competency requirement" means that "subsequent attempts to secure relief in federal court" are permitted "if the state court lacked jurisdiction over the federal statutory claim." 470 U.S. at 383 n.3. Restatement § 26 also allows for the tension between possible claim splitting and the rule against claim preclusion in these circumstances. It makes clear that the rule is an "exception" to the general prohibition on claim splitting.

Still, Joslyn insists, a decision that claims are not precluded based only on their federal exclusivity will lead to gamesmanship. Joslyn theorizes that plaintiffs' lawyers will bring state-law claims without their exclusively federal counterparts (like securities or antitrust claims) in state court, see how that litigation goes, and if it goes poorly, switch gears and bring federal claims in federal court. We are not so worried. For one, an overt practice of claim splitting amounts to bad-faith

litigation. For another, other statutory and doctrinal bars should serve to prevent such gamesmanship. Federal statutes of limitations, for example, will not toll simply because a state-law claim was filed. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 793–94 (7th Cir. 2006). And issue preclusion, or collateral estoppel, prohibits plaintiffs from relitigating facts, even if not claims, that the state court already resolved.

Joslyn makes one more argument worth addressing. Whatever *Marrese* thought "jurisdictional competency," means, Joslyn says, Indiana interprets it differently. It cites Indiana cases that describe jurisdictional competence as meaning that the earlier suit "was based on proper jurisdiction." *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006). That generic description is surely one aspect of jurisdictional competency. But it does not foreclose a broader meaning in a different context—as *Marrese*, Restatement § 26, and many other courts have understood it in the context we face. The only Indiana case to touch on that context was *Green*. We think it clear that Indiana's highest court would continue with the course *Green* mapped and find no jurisdictional competency here.

### 2.   CERCLA's Statute of Limitations

Joslyn's second defense is a timeliness one. The applicable limitations period for CERCLA cost-recovery claims depends on whether, and when, "removal" or "remediation" occurred. *See* 42 U.S.C § 9613(g)(2)(A)–(B). For removal actions, the time to file suit expires three years after the removal is complete. For remedial action, however, the time expires six years after the remedial action's initiation. The parties agree Valbruna started remedial action in 2005. The question is whether there was earlier remedial action—namely, in the 1980s or in 1991, when Slater performed cleanup. Joslyn thinks that cleanup

was remedial, and thus, this action is untimely. *Id.* § 9613(g)(2)(B). Valbruna contends Slater's actions were only removals, and so this suit, filed within six years of the remediation that began in 2005, is timely. *Id.*

We agree with Valbruna. The parties do not dispute the underlying facts, and therefore we can decide how to characterize the earlier cleanups—as removal or remediation—as a matter of law. *See New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 126 (2d Cir. 2013); *United States v. Navistar Int'l Transp. Corp.*, 152 F.3d 702, 707 (7th Cir. 1998).

Removal and remediation are terms of art under CERCLA. CERCLA defines a removal as "the cleanup or removal of released hazardous substances from the environments," and it defines remedial actions as "those actions consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(23), (24). In clearer terms, removal generally "refers to a short-term action taken to halt risks posed by hazardous wastes immediately." *Frey v. E.P.A.*, 403 F.3d 828, 835 (7th Cir. 2005). Remedial actions "are longer term, more permanent responses." *Bernstein v. Bankert*, 733 F.3d 190, 201 n.5 (7th Cir. 2013). Filling in those definitions further, a removal action is usually one that: is designed as an interim or partial fix; performed in response to an immediate threat; is short in length; does not address the entire problem; and/or does not address the root of the problem. On the other hand, remedial action is generally: designed as a permanent or complete fix; performed not in response to an imminent environmental threat; lengthy; designed to address the root of the problem; and/or designed to address the entire problem. *See* 42 U.S.C. §§ 9601(23), (24); *Next Millenium Realty, LLC*, 732 F.3d at 127; *United States v. W.R. Grace & Co.*, 429 F.3d 1224,

1244–45 (9th Cir. 2005); *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1240 (10th Cir. 2003). Given the potential for overlap between the two characterizations, courts decide the removal-or-remediation question on a case-by-case basis. No one characteristic of the cleanup is usually dispositive. *See Pub. Serv. Co. of Colorado v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999) ("Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed.").

Here, neither the 1980s cleanup nor the 1991 work constituted remedial action. In the 1980s, Slater excavated sludge and soil from just two areas of the site (a former surface impoundment and waste pile). That was far from a comprehensive or permanent action. It was a temporary solution, covering only a part of the plant's pollution causes. Slater also performed the work in response to the threat the waste posed to nearby water sources, which was of concern to regulators. As for the 1991 work, Slater filled the excavated area at the surface impoundment area with clean soil. It then constructed a concrete cap for that area, and Slater implemented a groundwater detection monitoring program. Again, this was a limited fix: it focused only the impoundment lot. And the capping, too, was performed in response to an impending environmental threat, as regulators highlighted for Slater.

Joslyn makes a few points in response. It argues, first, that the length of the 1980s cleanup—nearly eight years—means it was a remedial, not removal, action. The length of a cleanup is not dispositive, however, and here the circumstances and limitations of the excavation outweigh the length of time it took to complete the task. *See Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934 (6th Cir. 2004). Joslyn also contends

that neither of the cleanups was in response to an imminent and serious environmental hazard. Even so, the evident limitations of the earlier cleanups, both in terms of space and the amount of pollution, do not persuade us that they were remedial under CERCLA.

Joslyn argues further that the work Slater performed was "consistent" with remediation. Indeed, Joslyn argues, Slater excavated the sludge and installed the cap as a part of the "Voluntary *Remediation* Plan" it had with IDEM. But we, like the district court, see little merit in this argument. As the district court put it, "every removal action is consistent with every remedial reaction in that all are attempts to alleviate environmental concerns." The key considerations here are the circumstances and purpose of Slater's work, and those considerations show that the work was not remedial.

Joslyn, finally, sets aside the 1980s work and focuses on the 1991 capping. What, Joslyn asks, could be more permanent than a concrete cap? And, as Joslyn points out, permanent "confinement" of pollutants is one of CERCLA's examples for what may constitute remedial action. 42 U.S.C. § 9601(24); *see also Navistar Int'l Transp.*, 152 F.3d at 711 (assuming, based on parties' concessions, that a clay cap was a part of a remediation effort). Here, however, Joslyn's argument prioritizes form (the cap's makeup) over function (the cap's purpose and effect). The concrete cap covered just one area, and not even Joslyn seriously contends that it was meant to substantially resolve the bulk of the site's ongoing pollution problems. So while the fix may have been permanent, it

was so far from comprehensive that we cannot say it was a remedial action.[4]

## B. Valbruna's Cross-Appeal

We turn now to Valbruna's cross-appeal. Valbruna challenges two of the district court's decisions: first, the decision that Valbruna's ELA claim was precluded by the earlier state-court suit, and second, the decision to reduce the costs by $500,000 and then hold Valbruna liable for 25%.

### 1. ELA Claim Preclusion

As noted earlier, Indiana law requires privity between claimants for res judicata to apply. *E.g.*, *Freels*, 94 N.E.3d at 342. The district court concluded that Valbruna was a privy of Slater, which had filed the state-court suit over cleanup costs and from which Valbruna purchased the site. Valbruna takes issue only with this privity decision on appeal. The district court granted Joslyn summary judgment on the ELA claim, thus our review is de novo. *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

Under Indiana law, a privy includes "one who after rendition of [a] judgment has acquired an interest in the subject

---

[4] Because we affirm on this ground, we need not delve into the district court's alternative reason for finding the CERCLA claim timely: that even if the earlier cleanups were remedial, they were separate "operable units" from Valbruna's current cleanup. We note that we appear to have recognized that ground before. *See Bernstein v. Bankert*, 702 F.3d 964, 984 (7th Cir. 2012), *amended and superseded on reh'g*, 733 F.3d 190 (7th Cir. 2013). But other circuit courts have rejected the idea that there can be multiple removal or remediation actions at a given site. *See Sunoco, Inc.*, 337 F.3d at 1241; *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir. 1994). We leave for another day whether our decision in *Bernstein* represents a circuit split on the question.

matter affected by the judgment." *Becker v. State*, 992 N.E.2d 697, 700–01 (Ind. 2013); *Webb v. Yeager*, 52 N.E.3d 30, 40 (Ind. Ct. App. 2016). The post-judgment acquisition may occur "through or under one of the parties, as by inheritance, succession, or purchase." *Hockett v. Breunig*, 526 N.E.2d 995, 1000 (Ind. Ct. App. 1988). And an "entity does not have to control a prior action … for privity to exist." *Becker*, 992 N.E.2d at 700–01.

Whether Valbruna was in privity with Slater turns on the "subject matter affected" by the earlier judgment. That subject matter was the site and the costs Slater sought to recover. Slater, the site's owner, brought the state-court suit to collect under the ELA statute the costs incurred for cleanup at the site. After Valbruna's purchase, Valbruna had the right to intervene in the suit and similarly pursue those costs. With the subject matter clear, so too is Valbruna's privity with Slater. By purchasing the site it "acquired an interest" in both the site and the potential cost recovery. *Id.* at 701.

Valbruna's counterarguments miss the mark. It argues, for example, that there was no privity because at the time of its purchase it had not yet incurred any cleanup related costs. Privity, however, exists when one "acquire[s] an interest in the subject matter affected by the judgment." *Webb*, 52 N.E.3d at 40. Valbruna acquired an interest in the thing over which the state-court suit was fought. That is enough for privity under Indiana law.

Valbruna also advances a different conception of the relevant subject matter. It submits that the subject matter was not the property, or even the costs sought, but instead the Asset Purchase Agreement between Joslyn and Slater. This conception is too narrow. The agreement was a part of the state-court

suit, to be sure, but the claims there, like the ones here, were brought by the site's current owner to collect costs owed for Joslyn's operation of the site, including through the ELA statute. Valbruna gives us no reason to ignore those salient features of the state-court action and instead focus on just the agreement.

### 2. Allocation of Costs

That leaves the district court's equitable allocation of costs. CERCLA gives district courts the discretion not only to decide how to ultimately divvy cleanup costs, "but it also grants the court the authority to decide which equitable factors will inform its decision in a given case." *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 695 (7th Cir. 2014).

Courts usually look to the "Gore factors"—named after then-Congressman Al Gore—to decide allocation. The Gore factors include, among other things, the parties' respective fault for the pollution, the degree of toxicity of the pollution, and the care exercised by the respective parties. *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992). But these factors are neither binding nor exhaustive, and courts may "consider any factors appropriate to balance the equities in the totality of the circumstances." *Id.* at 509. We will not reverse unless the district court's decision about which factors apply was irrational. *NCR Corp.*, 768 F.3d at 700.

Valbruna first takes issue with the district court's decision to reduce the amount it could recover, more than $2,000,000, by $500,000. It did so believing that Valbruna had accounted for at least $500,000 in cleanup costs before purchasing the site, as evidenced by the PPA with IDEM. Thus, reasoned the district court, not reducing the recovery amount by that sum

would sanction "double recovery" for Valbruna, which would be inequitable. That decision was rational.

Valbruna concedes that a district court can consider the potential windfall for a plaintiff that stands to collect more than it has actually lost. But the problem, Valbruna says, is that there was "no evidence" of a potential windfall. There may have been no *direct* evidence of the windfall, like a cost-based comparison, but that is not a requirement under CERCLA. The district court could, as it did, reasonably infer the potential windfall from the existing record. It is not a hard inference to draw: if a rational buyer pursues a piece of property knowing that it will have to spend X for cleanup, it will discount the potential value of the property by X and accordingly reduce its purchase price by X. "No sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for the cleanup or not." *W. Properties Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 691 (9th Cir. 2004), *abrogation on other grounds recognized in Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 931 (9th Cir. 2008). So from the PPA, which Valbruna, a sophisticated, experienced, well-lawyered manufacturer, entered into, the district court could rationally infer that Valbruna considered the $500,000 PPA payment as "functionally part of the price."

Valbruna also cites *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 362 (3d Cir. 2018), but that case was different. In *Trinity Indus.*, the Third Circuit vacated the district court's imposition of a 10% equitable deduction from the recoverable costs because, as a result of the cleanup, the property's value increased. The Third Circuit recognized the valid equitable concern behind the deduction (to prevent windfall

recoveries), yet it held that without evidence of how much the property's value had increased the deduction lacked evidentiary support. Here, however, the district court did not peg the deduction ad hoc without evidence. Valbruna's prepurchase decision to put the $500,000 in escrow suggests strongly that Valbruna considered it (a) to be a necessary cleanup-related liability and (b) factored it into the purchase price accordingly. More evidence would have been preferable, but the district court's decision was rational.

The second challenge Valbruna makes is to the district court's decision to hold Valbruna accountable for 25% of past and future costs. Valbruna tells us that this number is unprecedented, and that no court has ever held a no-fault owner to more than 10% of the costs.

We agree that the 25% imposition is striking, but we disagree that the district court exceeded its discretion. The district court's decision was based on the evidence and reasoned. The court cited the fact that Valbruna clearly understood the site's serious pollution problems before deciding to purchase it—so caveat emptor. Valbruna offers no reason why that consideration was inappropriate. There was also evidence that Valbruna paid far less than the asking price, $6.4 million compared to $20 million, and far less than the amount for which it ultimately insured the site, around $80 million. So, again, the district court was rationally concerned about a windfall for Valbruna. The district court's 25% imposition on a no-fault owner reached the limits of its discretion, but we see no abuse of that discretion based on the facts of this case.

AFFIRMED